*Oneida Indian Nation v. Phillips, et al.*

# In the
# United States Court of Appeals
## for the Second Circuit

―――――――

AUGUST TERM 2019

No. 19-2737-cv

ONEIDA INDIAN NATION,
*Plaintiff-Counter Defendant-Appellee*,

v.

MELVIN L. PHILLIPS, SR. INDIVIDUALLY AND AS TRUSTEE, MELVIN L.
PHILLIPS SR./ORCHARD PARTY TRUST,
*Defendants-Counter Claimants-Appellants*.

―――――――

On Appeal from the United States District Court
for the Northern District of New York

―――――――

ARGUED: JUNE 24, 2020
DECIDED: NOVEMBER 24, 2020

―――――――

Before: CABRANES, LOHIER, and MENASHI, *Circuit Judges*.

―――――――

Defendants-Counter Claimants-Appellants Melvin L. Phillips, Sr. and the Melvin L. Phillips, Sr./Orchard Party Trust appeal from a July 31, 2019 judgment entered in the United States District Court for the Northern District of New York (Glenn T. Suddaby, *Chief Judge*) principally granting the motion of Plaintiff-Counter Defendant-Appellee Oneida Indian Nation of New York ("the Nation") for judgment on the pleadings for its claims asserting a tribal right to possession of land under the Indian Commerce Clause, federal treaties and statutes, and federal common law. Phillips also appeals the District Court's decision and order dated November 15, 2018 granting the Nation's motion to dismiss Phillips's counterclaim. For the reasons set forth below, the November 15, 2018 decision and order and the July 31, 2019 final judgment of the District Court is **AFFIRMED**.

Judge Menashi concurs in part and concurs in the judgment in a separate opinion.

—————

MICHAEL R. SMITH (David A. Reiser, *on the brief*), Washington, DC, *for Plaintiff-Counter Defendant-Appellee, Oneida Indian Nation*.

JOSEPH R. MEMBRINO, Cooperstown, NY, (Claudia L. Tenney, Clinton, NY *on the brief*), *for Defendants-Counter Claimants-Appellants, Melvin L. Phillips, Sr. and the Melvin L. Phillips, Sr./Orchard Party Trust*.

JOSÉ A. CABRANES, *Circuit Judge*:

The principal question presented in this matter concerns the tribal right to possession of land under the Indian Commerce Clause of the U.S. Constitution,[1] federal treaties and statutes, and federal common law.

Defendants-Counter Claimants-Appellants Melvin L. Phillips, Sr. and the Melvin L. Phillips, Sr./Orchard Party Trust (together, "Phillips") appeal from a July 31, 2019 judgment entered in the United States District Court for the Northern District of New York (Glenn T. Suddaby, *Chief Judge*) principally granting the motion of Plaintiff-Counter Defendant-Appellee Oneida Indian Nation of New York ("the Nation") for judgment on the pleadings on its claims for declaratory and injunctive relief. Phillips also appeals the District Court's decision and order dated November 15, 2018 granting the Nation's motion to dismiss Phillips's counterclaim.

On appeal, Phillips argues that the District Court erred by granting: (1) the Nation's motion for judgment on the pleadings; and (2) the Nation's motion to dismiss Phillips's counterclaim.

We hold that: (1) the District Court correctly granted the Nation's motion for judgment on the pleadings because title was not

---

[1] U.S. CONST. art. I, § 8, cl. 3 ("Congress shall have Power . . . [t]o regulate Commerce with foreign Nations and among the several States, and with the Indian Tribes . . . ").

properly transferred to Phillips, and Phillips's defenses do not raise any issues of material fact that would preclude the requested declaratory and injunctive relief sought by the Nation; and (2) the District Court did not err by declining to apply an immovable property exception to tribal sovereign immunity in dismissing Phillips's counterclaim.

Accordingly, we **AFFIRM** the November 15, 2018 decision and order and the July 31, 2019 final judgment of the District Court.

## I. BACKGROUND

We draw the facts, which are undisputed unless specifically noted, from the District Court's decisions and orders dated November 15, 2018 and July 31, 2019[2] and from the record before us.

### A. Factual Background

This suit arises from a disputed tract of 19.6 acres of land in the Town of Vernon in Oneida County, New York, over which both the Nation and Phillips assert ownership ("the 19.6 Acre Parcel"). Before contact with Europeans, the Oneida Indian Nation owned and occupied over six million acres of land in the territory that would later become New York State.[3] Under the United States Constitution, Indian

---

[2] *Oneida Indian Nation v. Phillips*, 397 F. Supp. 3d 223 (N.D.N.Y. 2019); *Oneida Indian Nation v. Phillips*, 360 F. Supp. 3d 122 (N.D.N.Y. 2018).

[3] *See Oneida Indian Nation of N.Y. State v. Oneida Cnty., N.Y.*, 414 U.S. 661, 663-64 (1974) ("*Oneida I*").

relations were reserved exclusively to the federal government.[4] Throughout the 1780s and 1790s, the United States entered into several treaties with the Nation confirming the Nation's right of possession of their lands until the United States purchased those lands.[5] These treaties were incorporated into federal law by the Nonintercourse Act of 1790, subsequently codified at 25 U.S.C. § 177, which prohibited the conveyance of Indian lands without the consent of the United States.[6] In 1794, by signing the Treaty of Canandaigua, the United States recognized approximately 300,000 acres of the Nation's land as "their reservation[]."[7] The 19.6 Acre Parcel disputed in this case was located

---

[4] *See* Note 1, *ante*; *Worcester v. State of Ga.*, 31 U.S. 515, 519 (1832) (explaining that "that the whole power of regulating the intercourse with [the Indian nations], was vested in the United States"); *see also Oneida County, N.Y. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 234-35 (1985) ("*Oneida II*") ("From the first Indian claims presented, this Court recognized the aboriginal rights of the Indians to their lands."); *Cherokee Nation v. Georgia*, 30 U.S. 1, 17 (1831) (noting the "unquestioned right" of Indians to their lands); Felix S. Cohen, 1 Cohen's Handbook of Federal Indian Law § 5.01 (2019) (explaining that the Indian Commerce Clause is the basis for laws requiring federal approval for land sales by Indian tribes). Under federal common law, the Indian tribes own their land as common property in what is referred to as "Indian title" or "aboriginal title." *See id*. § 15.04(2). Tribal land may also be held by "recognized title," *i.e.*, that the title is recognized by a federal statute or treaty. *See id*. § 15.04(3).

[5] *See Oneida I*, 414 U.S. at 664.

[6] *See id*.; *Oneida II*, 470 U.S. at 245-46.

[7] *Oneida II*, 470 U.S. at 231 n.1 ("The Treaty of Canandaigua of 1794 provided: 'The United States acknowledge the lands reserved to the Oneida, Onondaga and Cayuga Nations, in their respective treaties with the state of New York, and called their reservations, to be their property; and the United States will never claim the same, nor disturb them . . . in the free use and enjoyment thereof:

within that reservation as of 1794. The State of New York has never attempted to obtain the 19.6 Acre Parcel. The United States has not withdrawn the 19.6 Acre Parcel from the Nation's reservation.[8]

In 1838, the United States and various New York State Indian tribes, including the Nation, entered into the Treaty of Buffalo Creek, an agreement which "contemplated the eventual removal of all remaining Native Americans in New York to reservation lands in Kansas."[9]

On June 25, 1842, New York State entered into a treaty with the Nation (the "1842 Treaty") to purchase a portion of the Nation's land, paying certain members of the Nation described in the treaty as "the Orchard Party of the Oneida Indians residing in the town of Vernon county of Oneida."[10] Prior to entering into the 1842 Treaty, New York

---

but the said reservations shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase.'" (quoting 7 Stat. 45)).

[8] *See Oneida Indian Nation v. Madison Cnty.*, 665 F.3d 408, 443 (2d Cir. 2011) ("It remains the law of this Circuit that the [the Nation's] reservation was not disestablished.").

[9] *Id.* at 416; *see generally* Act of Jan. 15, 1838, 7 Stat. 550.

[10] App'x 21 (A Treaty made June 25, 1842 with the Orchard Party of the Oneida Indians). We observe that the 1842 Treaty appears to have been entered into by New York State notwithstanding "Congress' clear policy that no person or entity should purchase Indian land without the acquiescence of the Federal Government" under the Nonintercourse Act. *Oneida II*, 470 U.S. at 232; *see also* Cohen, Handbook of Federal Indian Law § 15.06 (citing the Nonintercourse Act and explaining that only the United States can extinguish Indian title; thus, "[a] seller or buyer of tribal

6

State surveyed part of the reservation, by which it divided the land in question into four numbered lots.[11] The 19.6 Acre Parcel is entirely within Lot 3 (referred to as the Marble Hill tract). The 1842 Treaty did not convey Lot 3 to New York State, but rather, listed the names of members of the Nation who intended to continue living within Lot 3.[12]

In 2013, a comprehensive settlement agreement in a civil lawsuit in the Northern District of New York, to which the United States was a party, was reached between the State of New York, Madison County, Oneida County, and the Nation to resolve all legal disputes regarding land, taxation, and governance.[13] This agreement provided that the land designated as Lot 3 of the 1842 Treaty: (1) was excluded from the sale in the 1842 Treaty; (2) is "Nation Land" located within the Oneida

---

land must show clear authority in federal law to allow a transfer of the interest from the tribe"). Nonetheless, the validity of the 1842 Treaty with New York State under federal law is irrelevant here because this matter concerns land—the 19.6 Acre Parcel—that was categorically *not* conveyed under the 1842 Treaty. *See* App'x 11 (Complaint, ¶¶ 15-17); *see also* Note 12, *post*.

[11] *See* App'x 37 (depicting the surveyed territory and the four lots).

[12] *See* App'x 27 (reciting the names of members of the Nation). The United States recognizes that the 19.6 Acre Parcel was not conveyed as part of the 1842 Treaty. *See* App'x 38 (Bureau of Land Management map, filed by the United States in Oneida land claim litigation, depicting the land within the Oneida reservation that New York State sought to obtain).

[13] *See generally New York v. Jewell*, 2014 WL 841764, at *1-2 (N.D.N.Y. 2014); *see also* App'x 39-58 (Settlement Agreement by the Oneida Nation, the State of New York, the County of Madison, and the County of Oneida). Sally Jewell, Secretary of the United States Department of the Interior, was the named defendant in that action and the Nation participated as an intervenor-defendant.

7

reservation; (3) is subject to the Nation's assertion of "sovereignty" and "rights under federal law"; and (4) is not subject to state or local taxation or regulation.[14] This settlement was approved by the United States District Court for the Northern District of New York (Lawrence E. Kahn, *Judge*), which incorporated it into a memorandum decision and order dated March 4, 2014 and under which it thereafter retained enforcement jurisdiction.[15]

The Nation's land surrounding the 19.6 Acre Parcel is called "the Orchard" or "Marble Hill."[16] The United States has recognized that there is one Oneida Indian Nation in New York State, and some of its members live in Marble Hill.

Although all parties concede that Phillips is a member of the Nation, Phillips has on several occasions asserted that the Orchard Party or Marble Hill Oneidas are a separate tribe from the Nation, and he has claimed to represent that separate tribe. On September 1, 2015, Phillips recorded a quitclaim deed with a trust declaration titled "Melvin L. Phillips, Sr./Orchard Party Trust" (the "Orchard Party Trust" or "trust"), naming himself both as grantor of the 19.6 Acre Parcel and as sole trustee of the trust.[17] The declaration states that

---

[14] *See* App'x 40-41, 49-50, 52 (Settlement Agreement).

[15] *See Jewell*, 2014 WL 841764, at *12.

[16] App'x 13 (Complaint, ¶ 19).

[17] App'x 60 (quitclaim deed), 103 (trust declaration) (capitalization omitted). The trust declaration does not name a grantee, but it appears that Phillips intended himself, as trustee, to serve as such.

8

Phillips "hereby transfers and conveys to the Trustee [*i.e.*, Phillips] (by deed recorded in the Oneida County Clerk's Office) certain real property as more particularly and specifically described on the attached Schedule A . . . ."[18] Schedule A of the trust instrument describes four parcels of land.[19] "Parcel IV" comprises the 19.6 Acre Parcel in question and the access road/driveway leading to it from Marble Road.[20] The trust documents state that the 19.6 Acre Parcel is composed of "tribal lands belonging to the Oneida Nation/Orchard Hill Party," that Phillips is a "spokesman" and "representative" of the Orchard Party, and that the land was "under the stewardship of Melvin L. Phillips, Sr."[21]

**B. Procedural History**

The Nation filed this action in the United States District Court for the Northern District of New York on September 18, 2017, asserting, *inter alia*, its possessory rights over the 19.6 Acre Parcel identified in the trust deed and seeking: (1) declaratory relief stating that neither Phillips nor the Orchard Party Trust "owns or has any property interest in the 19.6 acres" and that the trust instrument and quitclaim deed Phillips recorded "are invalid and void so far as they concern the [19.6 Acre Parcel];" and (2) an injunction prohibiting

---

[18] *Id*. at 103 (trust declaration); *see also id*. at 62-64 (Schedule A).

[19] *Id*. Parcels I, II and III are not in dispute nor the subject of this lawsuit.

[20] App'x 63-64 (Schedule A).

[21] *Id*. at 64 (Schedule A), 103 (trust declaration) (capitalization omitted).

9

Phillips and the trust from claiming the 19.6 Acre Parcel or clouding its title.[22] Phillips filed an answer and a counterclaim, which the Nation moved to dismiss under Rule 12(b)(6).[23] Invoking the District Court's supplemental jurisdiction, Phillips's counterclaim requested (1) a declaration stating that the Nation does not have a property interest in the 19.6 Acre Parcel and that the quitclaim deed and trust are valid with respect to the 19.6 Acre Parcel; and (2) that the Nation be enjoined from claiming the 19.6 Acre Parcel or clouding its title.[24]

The parties agreed that: (1) the 19.6 Acre Parcel was within the lands recognized by the United States in the 1794 Treaty of Canandaigua as comprising the Nation's reservation; (2) the 19.6 Acre Parcel was never conveyed to New York State; and (3) the 1842 Treaty with New York State reserved the 19.6 Acre Parcel and certain other parcels from cession and declared that members of the Nation would continue to occupy those parcels "collectively in the same manner and with the same right, title and interest therein as appertained to them, the party so remaining before the execution of this treaty."[25] Accordingly, the dispute between the parties was limited to whether, after the 1842 Treaty with New York State, the tribal land rights over

---

[22] App'x 19; *see also Phillips*, 360 F. Supp. 3d at 125.

[23] *See Phillips*, 360 F. Supp. 3d at 125; *see also* App'x 112 (Phillips's Answer and Counterclaim), 6 (District Court docket, Doc. 24, Nation's Motion to Dismiss).

[24] *See Phillips*, 360 F. Supp. 3d at 125.

[25] *See* Appellee's Br. at 15; App'x 23.

the 19.6 Acre Parcel belonged to the Nation, or to the Orchard Party, the purportedly separate tribe that Phillips claimed to represent.

On November 15, 2018, the District Court granted the Nation's motion to dismiss Phillips's counterclaim pursuant to Rule 12(b)(6).[26] In so ruling, the District Court rejected Phillips's argument that the 19.6 Acre Parcel belonged to the Orchard Party.[27] The District Court noted in its decision that: (1) Phillips had conceded that the 19.6 Acre Parcel belonged to the Nation as of 1794; (2) Phillips did not allege a cession of the 19.6 Acre Parcel; and (3) the United States had "treated the Oneidas as a unified nation" in New York State, thereby foreclosing any "argument that the Court should consider [the]

---

[26] *See generally Phillips*, 360 F. Supp. 3d at 132-34. In setting forth the legal grounds and reasoning upon which it based its decisions granting both of the Nation's two motions here on appeal, the District Court stated that it granted the motions "for each of the numerous alternative reasons stated in [the Nation's] memoranda of law," accompanied by the District Court's own "analysis, which is intended to supplement but not supplant [the Nation's] arguments." *Id*. at 132; *see also Phillips*, 397 F. Supp. 3d at 230 (granting judgment on the pleadings "for each of the alternative reasons stated in [the Nation's] memoranda of law."). We have previously counseled (in other contexts) that district courts should articulate their own independent analysis and reasoning that support their rulings. *See, e.g.*, *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review."); *Rudenko v. Costello*, 286 F.3d 51, 65 (2d Cir. 2002) (remarking, in the context of habeas corpus, that "[w]hether the district court's ultimate decision turns on factual determinations or on a choice between competing legal principles or on the manner in which the legal principles are applied to the facts, the district court must provide an indication of its rationale that is sufficient to permit meaningful appellate review.").

[27] *See Phillips*, 360 F. Supp. 3d at 132-34.

Orchard Party Oneida as a separate tribe from [the Oneida Nation], with independent tribal rights to the 19.6 acres."[28] The District Court also determined that Phillips's counterclaim was barred by the Nation's tribal sovereign immunity.[29]

The Nation subsequently filed a motion for judgment on the pleadings pursuant to Rule 12(c), which the District Court granted on July 31, 2019.[30] In granting judgment for the Nation, the District Court concluded that there were no disputed issues of material fact because Phillips conceded that the 19.6 Acre Parcel was located within the Nation's reservation as recognized by the 1794 Treaty of Canandaigua, and the parties' rights could be determined based solely upon the relevant statutes and treaties. The District Court rejected Phillips's contention that the 1838 Treaty of Buffalo Creek between the Nation and the United States extinguished the Nation's land in New York State, and held that the 1838 Treaty "by its plain language…does not cede [the Nation's] right to the [19.6 Acre Parcel]" and does not "recognize any proprietary interest of the Orchard Party" in the 19.6 Acre Parcel.[31] The District Court also reiterated its conclusions in its earlier decision that the United States recognizes "the Oneidas as a single unified Nation," and that the Orchard Party is not "a separate

---

[28] *Id.* at 133.

[29] *See id*.; *see also* Note 36, *post*.

[30] *See Phillips*, 397 F. Supp. 3d at 225, 229-34.

[31] *See id*. at 231-32.

12

tribe from [the Nation]."[32] The judgment entered by the District Court declared: (1) that the 19.6 Acre Parcel belongs to neither Phillips nor the trust; (2) that the quitclaim deed and trust are void as to the 19.6 Acre Parcel; and (3) that Phillips and the trust were enjoined from thereafter claiming to own the 19.6 Acre Parcel.[33]

This timely appeal followed.

## II. DISCUSSION

We review *de novo* a district court's grant of judgment on the pleadings pursuant to Rule 12(c), accepting the complaint's factual allegations as true and drawing all reasonable inferences in favor of the non-moving party.[34] "To survive a Rule 12(c) motion, the complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face."[35] Applying this same standard, we review *de novo* a district court's order granting a motion to dismiss counterclaims under Rule 12(b)(6).[36]

---

[32] *Id*. at 231.

[33] *See id*. at 234.

[34] *See Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 178 (2d Cir. 2013). Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."

[35] *Kirkendall*, 707 F.3d at 178-79 (internal citation and quotation marks omitted).

[36] *See Menaker v. Hofstra Univ.*, 935 F.3d 20, 29-30 (2d Cir. 2019). The District Court also construed the Nation's motion to dismiss on grounds of tribal sovereign

13

**A. Judgment on the Pleadings**

**1.** *The District Court's Order Granting the Nation's Motion*

On appeal Phillips contends that he owns the 19.6 Acre Parcel individually, rather than as a representative of the Orchard Party. This position flatly contradicts his prior assertions in the Orchard Party Trust, the quitclaim deed, and the answer and counterclaim before the District Court, in which he stated that he was merely a "steward" or "trustee" of the 19.6 Acre Parcel, which "belong[ed] to the Oneida Nation/Orchard Hill Party."[37] Whether Phillips asserts individual ownership or ownership on behalf of the Orchard Party, however, we agree with the District Court that the dispute here can be resolved through analysis of the relevant treaties.

The parties agree that the Nation's reservation recognized in the 1794 Treaty of Canandaigua includes the entirety of the 19.6 Acre Parcel. We have repeatedly stated that the Nation's reservation has never been disestablished and, more specifically, that the 1838 Treaty of Buffalo Creek neither disestablished nor diminished it.[38] Phillips

immunity as made pursuant to Federal Rule of Civil Procedure 12(b)(1). "On appeal from such a judgment, we review factual findings for clear error and legal conclusions *de novo*." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (internal quotation marks omitted).

[37] *See, e.g.*, App'x 64, 72 (attachment to deed), 103 (trust declaration), 119 (Answer, ¶ 24).

[38] *See, e.g.*, *Upstate Citizens for Equality v. Jewell*, 841 F.3d 556, 563 (2d Cir. 2016) ("[T]he Oneidas' original reservation [following the 1794 Treaty of Canandaigua] was never officially 'disestablished.'"); *Oneida Indian Nation*, 665 F.3d

offers no valid reason for us to abandon or modify those conclusions. Phillips argues that Article 13 of the 1838 Treaty of Buffalo Creek reflects the transfer of the 19.6 Acre Parcel to his predecessors in interest (the Orchard Party Oneidas), but this argument is unavailing. By its plain terms, Article 13 does not effect *any* transfer of land—much less a transfer of the 19.6 Acre Parcel to the Orchard Party or to Phillips's ancestors. Article 13 provides as follows:

SPECIAL PROVISIONS FOR THE ONEIDAS RESIDING IN THE STATE OF NEW YORK

> ARTICLE 13. The United States will pay the sum of four thousand dollars, to be paid to Baptista Powlis, and the chiefs of the first Christian party residing at Oneida, and the sum of two thousand dollars shall be paid to William Day, and the chiefs of the Orchard party residing there, for expenses incurred and services rendered in securing the Green Bay country, and the settlement of a portion thereof; and they hereby agree to remove to their new homes in the Indian territory, as soon as they can

---

at 443 (noting that the Oneida's reservation was not disestablished by the 1838 Treaty of Buffalo Creek); *Oneida Indian Nation of N.Y. v. Madison Cnty., Oneida Cnty., N.Y.*, 605 F.3d 149, 157 n.6 (2d Cir. 2010) ("Our prior holding on this question—that the Oneidas' reservation was not disestablished, therefore remains the controlling law of this circuit." (internal citation and quotation marks omitted)); *Oneida Indian Nation of N.Y. v. City of Sherrill*, 337 F.3d 139, 161 (2d Cir. 2003) ("Nothing in [the Treaty of Buffalo Creek] provides 'substantial and compelling' evidence of Congress's intention to diminish or disestablish the Oneidas' New York reservation.").

15

make satisfactory arrangements with the Governor of the State of New York for the purchase of their lands at Oneida.[39]

This language clearly does not purport to cede any reservation land. Article 13 *does* contemplate future sales of land by members of the Nation who left New York. But Article 13 does not further recognize or bestow on members of the Nation (whether as individuals or subgroups) any right to sell land or exercise any other prerogatives of ownership.[40] Furthermore, Article 13 is entirely silent regarding any proprietary rights of members of the Nation—like Phillips's predecessors in interest—who did *not* leave New York. Therefore the District Court correctly held "as a matter of law, that the 1838 Treaty of Buffalo Creek did not recognize any proprietary interest of the Orchard Party Oneidas in the Property—as a 'faction' of [the

---

[39] 397 F. Supp. at 231 (quoting the 1838 Treaty of Buffalo Creek).

[40] Indeed, it is unclear whether Article 13 would authorize individual members of the Nation who left New York to complete land sales to New York State without the consent of the Nation and the United States. *See Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 665 (1979) ("Whatever title the Indians have is in the tribe, and not in the individuals, although held by the tribe for the common use and equal benefit of all the members."); *see also Solem v. Bartlett*, 465 U.S. 463, 470, *reh'g denied* 466 U.S. 948 (1984) ("[O]nly Congress can divest a reservation of its land and diminish its boundaries. Once a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire plot retains its reservation status until Congress explicitly indicates otherwise.") (citing *United States v. Celestine*, 215 U.S. 278 (1909)).

16

Nation] or otherwise—to arrange for the purchase of the Property with the Governor of the State of New York."[41]

Nor does the later 1842 Treaty with New York State support Phillips's claim to the 19.6 Acre Parcel; indeed, that treaty tends to undermine Phillips's arguments. The 1842 Treaty does not purport to change the ownership status of the tribal land not ceded to New York State. Since, as is undisputed, the unceded land—the Nation's reservation—includes the entire 19.6 Acre Parcel, the 1842 Treaty could not have transferred the 19.6 Acre Parcel to Phillips's ancestors. Moreover, the 1842 Treaty with New York State expressly provides that the unceded land, including the 19.6 Acre Parcel, was "to be had, held, enjoyed and occupied by [members of the Nation] *collectively* in the same manner and with the same right, title and interest therein as appertained to them."[42] This language suggests that until at least 1842, the 19.6 Acre Parcel was owned collectively, and not by Phillips's ancestors as private individuals, capable of transferring the land to Phillips by a chain of inheritance or bequest.[43] The District Court therefore also correctly concluded that title in the 19.6 Acre Parcel was

---

[41] *Id*. at 232. Moreover, the 1838 Treaty demonstrates that the United States treated the Oneidas as one nation. *See* App'x 132 (Article 2 of the treaty lists the following Tribes residing in New York State: "Senecas, Onondagas, Cayugas, Tuscaroras, Oneidas, St. Regis, Stockbridges, Munsees, and Brothertowns"); *see also Oneida Indian Nation of N.Y. v. New York*, 194 F. Supp. 2d 104, 119 n.8 (N.D.N.Y. 2002) (observing the "United States' post–1805 treatment of the Oneidas as a unified nation" as depicted in the 1838 Treaty of Buffalo Creek).

[42] *See* App'x 23 (1842 Treaty with New York State) (emphasis added).

[43] *See* Note 40, *ante*.

17

not transferred to Phillips or his ancestors under the 1842 Treaty with New York State.[44]

**2.** *The District Court's Rejection of Phillips's Affirmative Defenses*

Phillips contends that even if the 1838 Buffalo Creek Treaty and the 1842 Treaty with New York State did not transfer title in the 19.6 Acre Parcel to his ancestors, he is still entitled to relief pursuant to *City of Sherrill v. Oneida Indian Nation*.[45] In *Sherrill*, the Supreme Court applied a federal common law equitable defense to a claim of tribal ownership for lands that the Nation had reacquired 200 years after an allegedly unauthorized sale to New York State, and over which long chains of private landowners had held putative title.[46]

---

[44] Phillips initially maintained in the District Court that the 19.6 Acre Parcel belonged to an Orchard Party tribe of the Oneidas separate from the Nation. This position contradicts the language of the treaties and historical events. The 1838 Treaty, for example, demonstrates that the United States treated the Oneidas as one nation. *See* Note 41, *ante*. Phillips ultimately disclaimed the "separate-tribe" theory in the proceedings below and has now abandoned it on appeal. *See Phillips*, 397 F. Supp. 3d at 233 ("[Phillips] now agree[s] the Orchard Party is not a separate faction."); Appellants' Br. at 26 ("[This appeal] is not about Phillips' tribal membership or identity, or any claim by Phillips to possess tribal sovereignty or identity separate from [the Nation].").

[45] 544 U.S. 197 (2005).

[46] *Id.*; *see also Stockbridge-Munsee Cmty. v. New York*, 756 F.3d 163, 165-66 (2d Cir. 2014) (recognizing "the *Sherrill* equitable defense" and enumerating relevant factors, including whether the relief sought by the tribe would be "disruptive," whether there had been a "long lapse of time, during which the [tribe] did not seek

Phillips's invocation of *Sherrill* is unavailing because he cannot satisfy "the *Sherrill* equitable defense" factors.[47] First, the undisputed facts demonstrate that there is no "longstanding, distinctly non-Indian character of the [disputed land] and its inhabitants,"[48] given that the 19.6 Acre Parcel has been occupied or used by members of the Nation, including Phillips, for over 200 years. Second, there has been no "regulatory authority constantly exercised by New York State and its counties and towns" over the 19.6 Acre Parcel,[49] as it has not been subject to State or local taxation. Third, there has been no "long delay in seeking judicial relief against" Phillips or his ancestors.[50] Indeed, none publicly claimed title until 2015, when Phillips filed his quitclaim deed, and the Nation filed this suit just two years later.

Phillips raises several other equitable defenses that he claims would defeat the Nation's title to the 19.6 Acre Parcel, none of which succeed. He argues that the Nation's claims are barred by release[51] and

---

to revive [its] sovereign control through equitable relief in court," and whether there would be "dramatic changes in the character of the properties").

[47] *Stockbridge-Munsee*, 756 F.3d at 166 (referring to "the *Sherrill* equitable defense").

[48] *Sherrill*, 544 U.S. at 202.

[49] *Id.*

[50] *Id.*

[51] "A release is a provision that intends to present abandonment of a known right or claim." *McMahan & Co. v. Bass*, 250 A.D.2d 460, 461 (1st Dep't 1998).

19

by accord and satisfaction.[52] But even assuming equitable defenses beyond those described in *Sherrill* were available here, neither Phillips's counterclaim nor his answer to the Nation's complaint plausibly alleges that either release or accord and satisfaction exist.

Phillips also claims as a defense that the Nation abandoned any rights it may have the 19.6 Acre Parcel. It seems Phillips's theory is that the 1838 Buffalo Creek Treaty constituted the abandonment or discharge of the Nation's claim to the 19.6 Acre Parcel,[53] but that interpretation of the 1838 Treaty is incorrect, as explained above. Further, Phillips's abandonment defense is inconsistent with his own allegations, for Phillips alleges that the members of the Orchard Party have continuously occupied the land and, as Phillips now apparently concedes, the Orchard Party is part of the Nation. Finally, Phillips's position also runs counter to the law of this Circuit, according to which treaty-based or "recognized" Indian title are not lost simply because a tribe ceases to occupy a particular tract of land.[54] For the same reasons, Phillips's defense of acquiescence or estoppel fails.

---

[52] "Under New York law, an accord and satisfaction is the resolution of a disputed, unliquidated claim through a new contract 'discharging all or part of [the parties'] obligations under the original contract,' and constitutes a complete defense to a claim for breach of contract." *Carnrite v. Granada Hosp. Grp., Inc.*, 175 F.R.D. 439, 449 (W.D.N.Y. 1997) (quoting *Conboy, McKay, Bachman & Kendall v. Armstrong*, 110 A.D.2d 1042, 1042 (4th Dep't 1985)).

[53] *See* Appellants' Br. at 39-40.

[54] *See, e.g.*, *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 270 (2d Cir. 2005) (noting with approval the district court's conclusion that the "1794 Treaty of

20

Phillips contends that the Nation failed to join "necessary individuals" by not adding the federal, state, and county governments to the suit, who he maintains are all "indispensable parties[.]"[55] Phillips, however, does not offer any plausible reason for why any one of these governmental parties is required to be joined, or plausibly suggest an arguable interest in their participation as parties in this litigation.

In sum: the District Court correctly concluded that Phillips does not raise any viable affirmative defenses that would preclude judgment on the pleadings in favor of the Nation. And because the question of title is resolved by the interpretation of the relevant treaties, as discussed above, we likewise reject Phillips's meritless assertions that the Nation's complaint fails to state a claim upon which

Canandaigua conferred recognized title to the Cayugas concerning the land at issue" and that "proof of the plaintiffs' physical abandonment of the property at issue is irrelevant in a claim for land based upon reserved title to Indian land, for such title can only be extinguished by an act of Congress."(quoting *Cayuga Indian Nation of New York v. Cuomo*, 758 F. Supp. 107, 118 (N.D.N.Y. 1991)).

[55] Under Rule 19(a), a party is required to be joined if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest

Fed. R. Civ. P. 19(a)(1).

relief can be granted and that there are material facts in dispute that would preclude judgment for the Nation as a matter of law.

### B. Dismissal of Phillips's Counterclaim

The District Court granted the Nation's motion to dismiss Phillips's counterclaim on several alternative grounds, noting the "settled" precedent in this Circuit concerning tribal sovereign immunity.[56]

On appeal Phillips argues that the District Court erred in concluding that the Nation had sovereign immunity from suit. It is well settled that "courts must dismiss[] any suit against a tribe absent congressional authorization (or waiver) . . . and the Supreme Court (like this Court) has thought it improper suddenly to start carving out exceptions to that immunity, opting instead to defer to the plenary power of Congress to define and otherwise abrogate tribal sovereign immunity from suit."[57] In arguing that the District Court erred, Phillips relies on *Upper Skagit Indian Tribe v. Lundgren*, in which the Supreme Court described an immovable property exception to sovereign immunity.[58] But *Upper Skagit* does not suggest, much less

---

[56] *See* Note 36, *ante*.

[57] *Cayuga Indian Nation of N.Y. v. Seneca Cnty., N.Y.*, 761 F.3d 218, 220 (2d Cir. 2014) (citation and quotation marks omitted) (quoting *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014)).

[58] *See* 138 S. Ct. 1649, 1653-54 (2018) (involving a dispute over land that an Indian tribe had purchased on the open market, which had previously been (but was no longer) part of that tribe's reservation).

22

compel, a different result here. As we recently explained, in that case the Supreme Court expressly declined to decide whether the immovable property exception applied to *tribal* sovereign immunity, instead leaving that question for the Washington State Supreme Court to consider "in the first instance."[59] Moreover, even if the exception applied to tribal sovereign immunity generally, it would not apply here, where it is undisputed that the Nation did not purchase the 19.6 Acre Parcel in "the character of a private individual" buying lands in another sovereign's territory.[60] Therefore, to the extent that the District Court rested its decision to dismiss Phillips's counterclaim on the basis of tribal sovereign immunity, we cannot conclude the District Court erred by not applying the immovable property exception.[61]

On appeal Phillips does not challenge the grounds upon which the District Court granted the Nation's motion to dismiss Phillips's counterclaim pursuant to Rule 12(b)(6) for failure to plausibly state a claim for which relief can be granted. But, we note as a matter of logic that Phillips cannot prevail on his counterclaim, which purports to seek relief mirroring the relief sought by the Nation, where we

---

[59] *Cayuga Indian Nation of New York v. Seneca Cnty., N.Y.*, __ F.3d __, 2020 WL 6253332, at *4 (2d Cir. 2020); *see also Upper Skagit*, 138 S. Ct. at 1654 ("Although we have discretion to affirm on any ground supported by the law and the record that will not expand the relief granted below, . . . in this case we think restraint is the best use of discretion. Determining the limits on the sovereign immunity held by Indian tribes is a grave question . . . ." (internal citation omitted)).

[60] *Upper Skagit*, 138 S. Ct. at 1654.

[61] Insofar as the parties make further arguments on appeal regarding tribal sovereign immunity, we do not further address, nor express any view about, them.

conclude that the Nation was correctly entitled to judgment on the pleadings.[62]

As a final matter: our concurring colleague argues that we improperly affirm the District Court's dismissal of Phillips's counterclaim. In so doing, our concurring colleague appears to equate tribal sovereign immunity and subject matter jurisdiction.

As we have emphasized here, tribes possess the common-law immunity traditionally enjoyed by sovereign powers.[63] The Supreme Court has held that sovereign immunity is jurisdictional in nature.[64] We think that tribal sovereign immunity, however, is not synonymous with subject matter jurisdiction for several reasons. Tribal sovereign

---

[62] *See* Part II.A, *ante*. We further note that Phillips's counterclaim, to which the Nation raised, *inter alia*, tribal sovereign immunity as a basis for dismissal, falls within supplemental jurisdiction. A federal court has authority to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over claims not within federal jurisdiction only if there is a related claim that properly invokes the court's subject matter jurisdiction. *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164–65 (1997); *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 362 (2d Cir. 2000); *see also Cushing v. Moore*, 970 F.2d 1103, 1106 (2d Cir. 1992) (explaining that "[s]upplemental jurisdiction could be exercised only if some other, related claim provides a proper basis for federal jurisdiction"). Here, it is undisputed that the Nation's claim against Phillips, which asserts a tribal right to possession of the 19.6 Acre Parcel and which is wholly independent of state law, arises under federal law. *See Oneida I*, 414 U.S. at 666. Phillips's counterclaim, which seeks relief mirroring that sought by the Nation, thus arises out of a common nucleus of operative fact, falling squarely within our supplemental jurisdiction. *Int'l Coll. of Surgeons*, 522 U.S. at 164–65.

[63] *See* Note 57, *ante*; *see also Bay Mills Indian Cmty.*, 572 U.S. at 788; *Turner v. United States,* 248 U.S. 354, 357–58 (1919).

[64] *Fed. Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 475 (1994).

immunity may be waived in certain circumstances and is subject to the plenary power of Congress.[65] Lack of subject matter jurisdiction, on the other hand, may not be waived or forfeited.[66] Second, tribal sovereign immunity operates essentially as a party's possible defense to a cause of action.[67] In contrast, subject matter jurisdiction is "fundamentally preliminary" and an "absolute stricture[]" on the court.[68] Finally, a waiver of sovereign immunity cannot, on its own, extend a court's subject matter jurisdiction.[69] We observe that there appears to be a divergence of opinion as to the precise nature of tribal

---

[65] *See Bay Mills Indian Cmty.*, 572 U.S. at 788–89; *see also Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58–59 (1978).

[66] *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *New York v. Shinnecock Indian Nation*, 686 F.3d 133, 138 (2d Cir. 2012) ("Jurisdiction cannot be created by the consent of the parties.").

[67] *See Okla. Tax Comm'n v. Graham*, 489 U.S. 838, 841 (1989) (noting that although "[t]ribal immunity may provide a federal defense to [the plaintiff's] claims[,] . . . it has long been settled that the existence of a federal immunity to the claims asserted does not convert a suit otherwise arising under state law into one which, in the statutory sense, arises under federal law").

[68] *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979); *see also, e.g., Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006).

[69] *See, e.g., Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 401–02 (3d Cir. 2012) ("To confer subject matter jurisdiction in an action against a sovereign, in addition to a waiver of sovereign immunity, there must be statutory authority vesting a district court with subject matter jurisdiction." (quoting *Alvarado v. Table Mountain Rancheria*, 509 F.3d 1008, 1016 (9th Cir. 2007)); *Arford v. United States,* 934 F.2d 229, 231 (9th Cir. 1991) (explaining that in order to maintain an action against the United States, there must be both "statutory authority granting subject matter jurisdiction" and "a waiver of sovereign immunity"); *Weeks Constr., Inc. v. Oglala Sioux Hous. Auth.*, 797 F.2d 668, 671 (8th Cir. 1986).

sovereign immunity, but that there is no need to address, much less resolve, it here.[70]

We thus affirm the District Court's order dated November 15, 2018 granting the Nation's motion to dismiss Phillips's counterclaim.

## III. CONCLUSION

To summarize, we hold as follows:

(1) The District Court correctly granted the Nation's motion for judgment on the pleadings because title was not properly

---

[70] *Compare Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 515 n. 19 (1982) (explaining sovereign immunity is not "jurisdictional in the sense that it must be raised and decided by this Court on its own motion"); *Pistor v. Garcia*, 791 F.3d 1104, 1110–11 (9th Cir. 2015) (stating "[t]he issue of tribal sovereign immunity is [quasi-]jurisdictional," and explaining "[s]overeign immunity's 'quasi-jurisdictional . . . nature,' by contrast, means that '[i]t may be forfeited where the [sovereign] fails to assert it and therefore may be viewed as an affirmative defense'" (internal citations omitted)); *Oglala Sioux Tribe v. C & W Enterprises, Inc.*, 487 F.3d 1129, 1131 n.4 (8th Cir. 2007) (explaining that, "insofar as *Hagen* adverts to the topic of subject matter jurisdiction at all, it observes that we had previously stated that sovereign immunity is jurisdictional in nature but is not of the same character as subject matter jurisdiction" (citing *Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1043 (8th Cir. 2000) and *In re Prairie Island Dakota Sioux*, 21 F.3d 302 (8th Cir. 1994)); *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 28 (1st Cir. 2000) ("[A]lthough tribal sovereign immunity is jurisdictional in nature, consideration of that issue always must await resolution of the antecedent issue of federal subject-matter jurisdiction."), *with Edelman v. Jordan*, 415 U.S. 651, 677–78 (1974) (noting that "the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court"); *Amerind Risk Mgmt. Corp. v. Malaterre*, 633 F.3d 680, 685 (8th Cir. 2011) ("We have held that tribal sovereign immunity is a threshold jurisdictional question." (citing *Hagen,* 205 F.3d at 1044)); *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1287 (11th Cir. 2015)

transferred to Phillips, and Phillips's defenses do not raise any disputes of material fact that would preclude the requested declaratory and injunctive relief sought by the Nation;

(2) The District Court correctly granted the Nation's motion to dismiss Phillips's counterclaim.

For the foregoing reasons, we **AFFIRM** the November 15, 2018 decision and order and the July 31, 2019 final judgment of the District Court.

---

("We have an obligation to make sure we have jurisdiction to hear this action, which requires us to first consider whether the defendants enjoy tribal sovereign immunity from Alabama's claims." (citing *Taylor v. Ala. Intertribal Council Title IV J.T.P.A.*, 261 F.3d 1032, 1034 (11th Cir. 2001)).

MENASHI, *Circuit Judge*, concurring in part and concurring in the judgment:

I concur in Part II.A.1. of the court's opinion, in which the court holds that neither the Treaty of Buffalo Creek nor the 1842 Treaty with New York State transferred title to the 19.6 Acre Parcel from the Oneida Indian Nation to the Orchard Party or to Melvin Phillips's ancestors. I write separately because the court makes three errors in the remainder of its opinion.

First, the court concludes that the district court did not err in dismissing Phillips's counterclaim on the ground of tribal sovereign immunity. *Ante* at 22-24. I agree that no "immovable property exception" to tribal sovereign immunity applies in this case. *Id.* at 23. The district court nevertheless erred, however, because the Nation waived its tribal sovereign immunity for Phillips's counterclaim seeking the same relief as the Nation sought in its suit.

Second, the court includes extensive dicta questioning our precedents that hold tribal sovereign immunity to be a limit on our subject-matter jurisdiction. *Id.* at 24-26. The court speculates that tribal sovereign immunity should perhaps be reconceptualized as belonging to some category of jurisdiction that limits a court's power to act but is "not synonymous with subject matter jurisdiction." *Id.* at 25. I believe these dicta are misguided.

Third, the court correctly concludes that Phillips cannot establish a *Sherrill* equitable defense but then "assum[es]," while leaving the question open, that "equitable defenses beyond those described in *Sherrill* [a]re available." *Id.* at 20. I would conclude that such defenses are not available.

Despite these disagreements, I concur in the court's judgment because Phillips's counterclaim fails on the merits, because the court's

dicta about sovereign immunity are unrelated to its judgment, and because Phillips does not establish a *Sherrill* equitable defense.

**I**

The court's opinion concludes that the district court did not err in dismissing Phillips's counterclaim as barred by tribal sovereign immunity. *Id.* at 22-23. Although I agree with the court that the district court did not err in declining to apply an immovable property exception to tribal sovereign immunity in this case, I would hold that the Nation waived its sovereign immunity for Phillips's limited counterclaim, which seeks the same relief in his favor that the Nation seeks for the 19.6 Acre Parcel.

The Supreme Court held in *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505 (1991), that a tribe does not waive its sovereign immunity from counterclaims simply by bringing suit. Thus, the mere fact that a tribe has brought suit does not waive its immunity for all counterclaims.

Many courts have recognized, however, that a tribe *does* waive its immunity for counterclaims that arise out of the same transaction and would defeat or reduce the tribe's requested relief. This "recoupment" principle is well established in the context of both tribal sovereign immunity and federal sovereign immunity. The Tenth Circuit has explained the scope of the rule, which applies to the United States and "equally applies to Indian tribes":

> [W]hen the sovereign sues it waives immunity as to claims of the defendant which assert matters in recoupment—arising out of the same transaction or occurrence which is the subject matter of the government's suit, and to the extent of defeating the

2

government's claim but not to the extent of a judgment against the government which is affirmative in the sense of involving relief different in kind or nature to that sought by the government or in the sense of exceeding the amount of the government's claims; but the sovereign does not waive immunity as to claims which do not meet the "same transaction or occurrence test" nor to claims of a different form or nature than that sought by it as plaintiff nor to claims exceeding in amount that sought by it as plaintiff.

*Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1344 (10th Cir. 1982) (quoting *Frederick v. United States*, 386 F.2d 481, 488 (5th Cir. 1967)). Phillips's request for title in this case is the same type of relief and in the same degree as what the Nation sought for the same parcel of land, and therefore the counterclaim sounds in recoupment.

The Tenth Circuit later confirmed that the recoupment doctrine survived *Oklahoma Tax* because the counterclaims there "were not recoupment claims," and thus *Oklahoma Tax* "says nothing about the applicability of the recoupment doctrine as a waiver of tribal sovereign immunity when the defendant's counterclaims do sound in recoupment." *Berrey v. Asarco Inc.*, 439 F.3d 636, 644 n.5 (10th Cir. 2006); *see also id.* at 646 (explaining that "[b]ecause Defendants' counterclaims arise from the same transaction or occurrence as the Tribe's claims and seek relief of the same kind or nature, but not in excess of the amount sought by the Tribe, they are claims in recoupment," and therefore the tribe had waived immunity as to those claims).

After *Oklahoma Tax*, other circuits have recognized similar waivers of tribal sovereign immunity to adjudicate claims that arise

out of the same transaction and seek relief that is a mirror image of, or would defeat or undercut, the tribe's requested relief. For example, in a case that cites *Oklahoma Tax*, the Eighth Circuit held that tribal sovereign immunity did not bar the defendants' counterclaims regarding the same disputed piece of land because "[w]hen the Tribe filed this suit, it consented to and assumed the risk of the court determining that the Tribe did not have title to the disputed tracts[,]" and "[b]y requesting equitable relief, the Tribe consented to the district court exercising its equitable discretion to resolve the status of the disputed lands." *Rupp v. Omaha Indian Tribe*, 45 F.3d 1241, 1245 (8th Cir. 1995); *see also Rosebud Sioux Tribe v. Val-U Const. Co. of S.D.*, 50 F.3d 560, 562 (8th Cir. 1995) ("When a tribe brings a lawsuit, it does not waive immunity for counterclaims, *except for matters asserted in recoupment*.") (emphasis added) (internal citation omitted) (citing *Oklahoma Tax*, 498 U.S. at 509).

In *Quinault Indian Nation v. Pearson for Estate of Comenout*, the Ninth Circuit held that "counterclaims to recoup damages arising from the same transaction or occurrence as a tribe's claims do not violate the tribe's sovereign immunity," 868 F.3d 1093, 1099 (9th Cir. 2017), even though—based on the authority of *Oklahoma Tax*—it also recognized that tribal sovereign immunity generally extends to counterclaims and "even extends to compulsory counterclaims *in excess of the original claims*—despite the fact that compulsory counterclaims by definition arise out of the same transaction or occurrence," *id.* at 1097 (emphasis added).

Although this court has not addressed this issue in the specific context of tribal sovereign immunity, our precedent dictates that the same rule applies here. This court has held that when the United States sues, it necessarily "waives immunity as to claims of the defendant which assert matters in recoupment"—meaning the

4

defendant may counterclaim against the sovereign, but the counterclaim must arise out of the same underlying dispute as the sovereign's claim, must be limited to the same type of relief sought by the sovereign, and cannot exceed the potential recovery by the sovereign. *United States v. Forma*, 42 F.3d 759, 765 (2d Cir. 1994) (quoting *Frederick*, 386 F.2d at 488). The recognition of this rule for the sovereign immunity of the United States is significant because "[t]ribal sovereign immunity is deemed to be coextensive with the sovereign immunity of the United States." *Miner Elec., Inc. v. Muscogee (Creek) Nation*, 505 F.3d 1007, 1011 (10th Cir. 2007); *Chayoon v. Chao*, 355 F.3d 141, 143 (2d Cir. 2004) ("Indian tribes enjoy the same immunity from suit enjoyed by sovereign powers and are 'subject to suit only where Congress has authorized the suit or the tribe has waived its immunity.'").[1] Our precedent therefore provides that the recoupment rule applies in the context of tribal sovereign immunity.[2]

---

[1] *See also United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 514 (1940) ("[T]he suability of the United States and the Indian Nations, whether directly or by cross-action, depends upon affirmative statutory authority. Consent alone gives jurisdiction to adjudge against a sovereign."); *Spurr v. Pope*, 936 F.3d 478, 484 (6th Cir. 2019) ("[T]ribal sovereign immunity is deemed to be coextensive with the sovereign immunity of the United States.") (quoting *Miner*, 505 F.3d at 1011); *Quinault*, 868 F.3d at 1100 ("[A] tribe's sovereign immunity is generally coextensive with that of the United States."); *Evans v. McKay*, 869 F.2d 1341, 1345 (9th Cir. 1989) ("The common law immunity afforded Indian tribes is coextensive with that of the United States and is similarly subject to the plenary control of Congress."); *Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 773 (D.C. Cir. 1986) ("An Indian tribe's immunity is co-extensive with the United States' immunity."); *Namekagon Dev. Co. v. Bois Forte Rsrv. Hous. Auth.*, 517 F.2d 508, 510 (8th Cir. 1975) ("Indian tribes have always been considered to have an immunity from suit similar to that enjoyed by the federal government.").

[2] Moreover, at least one district court in our circuit has applied the recoupment rule to a tribe. *Cayuga Indian Nation of N.Y. v. Seneca Cnty.*, 260

Absent the recoupment rule, tribes could never truly lose a case because courts would lack jurisdiction to enter a decision in favor of the defendant on a counterclaim arising from the same transaction underlying the tribe's claim. The court could say at most that the tribe did not prevail on its own claim, but the court could not say the defendant prevailed on its counterclaim for the same relief. *See Rupp*, 45 F.3d at 1245 ("We will not transmogrify the doctrine of tribal immunity into one which dictates that the tribe never loses a lawsuit. When the Tribe filed this suit, it consented to and assumed the risk of the court determining that the Tribe did not have title to the disputed tracts.") (internal citation omitted).

Applying the recoupment rule here, the Nation's action in bringing this suit effected a limited waiver of its sovereign immunity for Phillips's counterclaim, which—as the court acknowledges—"seek[s] relief mirroring the relief sought by the Nation" for the same piece of land. *Ante* at 24.[3] Because the court has jurisdiction over

F. Supp. 3d 290, 299 (W.D.N.Y. 2017) ("[W]here an Indian tribe seeks a declaration that a particular fact is true, e.g., that its reservation still exists, it necessarily waives its sovereign immunity as to a counterclaim seeking the exact opposite declaration.").

[3] Comparing the Nation's requests for relief with Phillips's requests demonstrates that both parties sought the same relief for the same parcel:

(a) The Nation: "Declar[e] that neither the trust nor Phillips, as an individual or otherwise, owns or has any property interest in the 19.6 acres." App'x 19. Phillips: "Declar[e] that [the Nation] does not own nor has any property interest in the 19.6 acres." App'x 128.

(b) The Nation: "Declar[e] that the trust document, the quitclaim deed and all related documents filed by Phillips in the Oneida County land records are invalid and void so far as they concern the 19.6 acres." App'x 19. Phillips: "Declar[e] that the trust document, the quitclaim deed and all related documents filed by Melvin L. Phillips, Sr. on behalf of the Orchard

Phillips's counterclaim pursuant to the recoupment rule, the district court should not have dismissed it for lack of jurisdiction. I nevertheless would affirm the dismissal because, as the court correctly explains in Part II.A.1. of its opinion, the Nation is entitled to judgment on its claim regarding ownership of the 19.6 Acre Parcel and therefore Phillips cannot state a claim for relief.

## II

After deciding that tribal sovereign immunity bars jurisdiction over Phillips's counterclaim—and affirming the district court's dismissal of that claim under Rule 12(b)(1)—the court engages in an extended disquisition on "the precise nature of tribal sovereign immunity." *Ante* at 26. The court ruminates inconclusively about the extent to which tribal sovereign immunity should be considered jurisdictional, suggesting that it falls into a jurisdictional category that

---

Party Oneida in the Oneida County land records are valid so far as they concern the 19.6 acres." App'x 128.

(c) The Nation: "Enjoin[] Phillips and the trust (i) not to claim the 19.6 acres for themselves, any beneficiary of the trust or any other person or entity, (ii) not to assert that Phillips, the trust, or any trust beneficiary owns or has a property interest in the 19.6 acres, and (iii) not to create or cause to be created, or filed or cause to be filed, in land records any document asserting that Phillips, the trust, any trust beneficiary or any other person or entity owns or has a property interest in the 19.6 acres." App'x 19. Phillips: "Enjoin[] [the Nation] (i) not to claim the 19.6 acres for itself, (ii) not to assert that [the Nation] owns or has a property interest in the 19.6 acres, and (iii) not to create or cause to be created, or file or cause to be filed, in land records any document asserting that [the Nation] owns or has a property interest in the 19.6 acres." App'x 128-29.

(d) The Nation: "Grant[] such other relief as the Nation may be entitled to at law or in equity." App'x 19. Phillips: "Grant[] such other relief as the Orchard Party Trust may be entitled to at law or in equity." App'x 129.

7

is "not synonymous with subject matter jurisdiction." *Id.* at 25. The court acknowledges that "there is no need to address" this issue, and the court admittedly does not "resolve" it, so the discussion is plainly dicta. *Id.* at 26; *see also United States v. U.S. Gypsum Co.*, 333 U.S. 364, 411 (1948) (Frankfurter, J., concurring) ("[T]he Court confessedly deals with an issue that 'need not be decided to dispose of this case.' Deliberate dicta, I had supposed, should be deliberately avoided.").

Nevertheless, the discussion conflicts with our precedent and is erroneous, as far as it goes. As we have said on numerous occasions, tribal sovereign immunity deprives a court of subject-matter jurisdiction over a lawsuit, and we routinely affirm decisions of district courts to dismiss for lack of subject-matter jurisdiction on the ground of tribal sovereign immunity. *See Chayoon*, 355 F.3d at 142-43 ("We affirm the district court's dismissal for lack of subject matter jurisdiction because [the defendant tribal officials] are immune from this suit. ... Indian tribes enjoy the same immunity from suit enjoyed by sovereign powers ... and neither abrogation nor waiver has occurred in this case."); *Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 84-85, 88 (2d Cir. 2001) (affirming the district court's dismissal of claims against a tribal agency "for lack of subject matter jurisdiction" because "an Indian tribe enjoys sovereign immunity from suit" absent congressional abrogation or waiver); *Laake v. Turning Stone Resort Casino*, 740 F. App'x 744, 745 (2d Cir. 2018) (holding that "the district court properly concluded that it lacked subject matter jurisdiction over the complaint against Turning Stone [because] Indian tribes have sovereign immunity from suit" absent congressional abrogation or waiver.); *Tassone v. Foxwoods Resort Casino*, 519 F. App'x 27, 28 (2d Cir. 2013) ("Tribal immunity also applies to entities, such as [defendant] Foxwoods Resort Casino, that are arms, agencies or subdivisions of the tribe. ... [T]he district court properly held that it lacked subject

8

matter jurisdiction due to Defendants' sovereign immunity."); *see also Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 885 (2d Cir. 1996) (Cabranes, J.) (noting that "[t]he exercise of subject matter jurisdiction" depends in part on "whether [a federal statute] constitutes a waiver of tribal sovereign immunity").

We have even affirmed a district court's dismissal for lack of subject-matter jurisdiction on the ground of tribal sovereign immunity while taking care to note that an alternative ground on which the district court relied—abstention under the tribal exhaustion rule—was *not* a matter of subject-matter jurisdiction. *See Garcia*, 268 F.3d at 80 ("[T]he district court erred by treating abstention on this ground as a matter of subject matter jurisdiction."); *id.* at 84-85, 88 (proceeding to affirm the district court's dismissal "for lack of subject matter jurisdiction" on tribal sovereign immunity grounds).

In support of its view, the court relies on one Supreme Court case from a period, 40 years ago, in which the Supreme Court doubted that state sovereign immunity was a jurisdictional issue. *See Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 515 n. 19 (1982) ("[W]e have never held that [state sovereign immunity] is jurisdictional in the sense that it must be raised and decided by this Court on its own motion."); *id.* at 519 (Powell, J., dissenting) ("The Court holds that the limitations on federal judicial power embodied in the Eleventh Amendment and in the doctrine of sovereign immunity are not jurisdictional."). The Court has since rejected those doubts in favor of the view that state sovereign immunity is jurisdictional. *See Alden v. Maine*, 527 U.S. 706, 730 (1999) ("[T]he constitutional principle of sovereign immunity does pose a bar to federal jurisdiction over suits against nonconsenting States."); *see also Allen v. Cooper*, 140 S. Ct. 994, 1002 (2020) (noting "the limits sovereign immunity places upon federal jurisdiction") (internal quotation marks and alteration

9

omitted); *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1496 (2019) (noting that, "[c]onsistent with [its] understanding of state sovereign immunity, [the Supreme] Court has held that the Constitution bars suits against nonconsenting States in a wide range of cases"); *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253-54 (2011) (noting that "we have understood the Eleventh Amendment to confirm the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant," and therefore "absent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State"); *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 766, 769 (2002) (noting that "[s]overeign immunity does not merely constitute a defense to monetary liability or even to all types of liability" but "provides an immunity from suit" the intrusion on which is "contrary to the[] constitutional design"); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 64 (1996) (noting that it had been "well established" by 1989 "that the Eleventh Amendment stood for the constitutional principle that state sovereign immunity limited the federal courts' jurisdiction under Article III" and that the Court's decisions were "clear that the Eleventh Amendment reflects 'the fundamental principle of sovereign immunity that limits the grant of judicial authority in Art. III'") (alteration omitted) (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 97-98 (1984)).

The "sovereign immunity" of "the Federal Government" also "is jurisdictional in nature." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *see also United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) ("Jurisdiction over any suit against the Government requires a

clear statement from the United States waiving sovereign immunity.").

Our court has repeatedly recognized that state sovereign immunity limits our subject-matter jurisdiction. *See McGinty v. New York*, 251 F.3d 84, 90 (2d Cir. 2001) ("Whether a federal court has subject matter jurisdiction is a question that may be raised at any time by the court *sua sponte*. Thus, the district court properly considered whether ... defendants had sovereign immunity that deprived it of subject matter jurisdiction.") (internal quotation marks, alteration, and citation omitted); *Close v. New York*, 125 F.3d 31, 38-39 (2d Cir. 1997) ("[U]nless New York waived its immunity, the district court lacked subject matter jurisdiction because [of] ... New York's sovereign immunity."); *Atl. Healthcare Benefits Tr. v. Googins*, 2 F.3d 1, 4 (2d Cir. 1993) ("Although the parties do not address the Eleventh Amendment in their briefs, we raise it sua sponte because it affects our subject matter jurisdiction."); *All. of Am. Insurers v. Cuomo*, 854 F.2d 591, 605 (2d Cir. 1988) ("[T]he Eleventh Amendment precludes the District Court from asserting subject matter jurisdiction over plaintiffs' state law claim."); *see also Bleichert v. N.Y. State Educ. Dep't*, 793 F. App'x 32, 34 (2d Cir. 2019) ("[T[he Eleventh Amendment precludes an individual from bringing a claim against a state or state agency under the ADEA, and federal courts do not have subject matter jurisdiction over such claims."); *Madden v. Vt. Sup. Ct.*, 236 F. App'x 717, 718 (2d Cir. 2007) ("The Eleventh Amendment precludes Madden from bringing suit against the state or state agencies, because it deprives the federal courts of subject matter

jurisdiction over any action asserted by an individual against a state regardless of the nature of the relief sought.").[4]

Our court has also said that the federal government's sovereign immunity limits our subject-matter jurisdiction. *See United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) ("[W]hen it comes to sovereign immunity ... express abrogation is a prerequisite to subject-matter jurisdiction."); *Dotson v. Griesa*, 398 F.3d 156, 177 (2d Cir. 2005) ("Because a finding of sovereign immunity would deprive this court of subject matter jurisdiction, we address that question first."); *Adeleke v. United States*, 355 F.3d 144, 147 (2d Cir. 2004) (holding that the plaintiff's "equitable claim for money damages should have been dismissed for lack of subject matter jurisdiction because sovereign immunity bars a federal court from ordering the United States" to provide that remedy.); *Forma*, 42 F.3d at 763 (noting that the "failure to satisfy the[] prerequisites" of the statute providing the federal

---

[4] The Supreme Court in 1998 said that it had "not decided" but would "mak[e] the assumption that Eleventh Amendment immunity is a matter of subject-matter jurisdiction." *Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 391 (1998). Based on this comment, some panels have suggested that the jurisdictional status of state sovereign immunity is an open question. *See, e.g.*, *Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013). But our court—along with other circuits—*has* decided this issue, and only the en banc court may revise those precedents. "While the Supreme Court has left this question open, our court has repeatedly referred to the Eleventh Amendment's restriction in terms of subject matter jurisdiction. ... [O]ur earlier circuit precedent continues to bind us." *United States v. Texas Tech Univ.*, 171 F.3d 279, 285 n.9 (5th Cir. 1999); *see also Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) ("Once effectively asserted, Eleventh Amendment immunity constitutes a bar to the exercise of federal subject matter jurisdiction.") (alterations omitted); *Seaborn v. Florida Dep't of Corrs.*, 143 F.3d 1405, 1407 (11th Cir. 1998) ("An assertion of Eleventh Amendment immunity essentially challenges a court's subject matter jurisdiction.").

government's consent to "a refund suit would normally deprive a district court of subject matter jurisdiction over any such refund action").[5]

As noted above, tribal sovereign immunity is coextensive with federal sovereign immunity.[6] Like our court, other circuits have recognized that tribal sovereign immunity—like other forms of sovereign immunity—deprives a court of subject-matter jurisdiction. *See Miner Elec., Inc. v. Muscogee (Creek) Nation*, 505 F.3d 1007, 1009 (10th Cir. 2007) ("Tribal sovereign immunity is a matter of subject matter jurisdiction."); *Victor v. Grand Casino–Coushatta*, 359 F.3d 782, 783 n.3 (5th Cir. 2004) (noting that "the question of tribal immunity" is a "matter[] of subject matter jurisdiction"); *Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1292 (11th Cir. 2001) ("[T]he Tribe's sovereign immunity deprives the district court of subject matter jurisdiction over [the] complaint.").

In its opinion today, the court observes that tribal sovereign immunity functionally serves as a defense to a cause of action and that a tribe may waive its sovereign immunity. But these aspects of tribal sovereign immunity do not suggest that tribal sovereign immunity is

---

[5] Other circuits agree. *See e.g.*, *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019) ("Sovereign immunity deprives the court of subject matter jurisdiction."); *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1151 (10th Cir. 2015) ("The defense of sovereign immunity is jurisdictional in nature, depriving courts of subject-matter jurisdiction where applicable."); *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 395 (3d Cir. 2012) ("Without a waiver of sovereign immunity, a court is without subject matter jurisdiction over claims against federal agencies or officials in their official capacities."); *United States v. Land, Shelby Cty.*, 45 F.3d 397, 398 n.2 (11th Cir. 1995) ("Sovereign immunity of the United States is an issue of subject matter jurisdiction.").

[6] *See supra* note 1 and accompanying text.

something other than a limit on a court's subject-matter jurisdiction. Whenever a defendant challenges a court's subject-matter jurisdiction, the defendant's invocation of the jurisdictional limitation functionally serves as a defense to the plaintiff's cause of action. If a plaintiff were to bring a state-law claim in federal court against a non-diverse party, the defendant would likely invoke jurisdiction as a defense. But that does not mean that federal-question and diversity jurisdiction are "not synonymous with subject matter jurisdiction." *Ante* at 25.

That a tribe may waive its immunity and thereby consent to be sued does not mean that its immunity does not limit the court's subject-matter jurisdiction. "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent*." The Federalist No. 81, at 487-88 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ) (emphasis added); *see also Alden*, 527 U.S. at 712 ("[T]he powers delegated to Congress under Article I of the United States Constitution do not include the power to subject *nonconsenting* States to private suits.") (emphasis added). A waiver of sovereign immunity—that is, the sovereign's consent—has long been understood to be a precondition to the exercise of subject-matter jurisdiction. *See Poodry*, 85 F.3d at 885; *see also Meyer*, 510 U.S. at 475 ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *United States v. Lee*, 106 U.S. 196, 204 (1882) ("[T]he United States cannot be lawfully sued without its consent in any case."); *United States v. Clarke*, 33 U.S. (8. Pet.) 436, 443 (1834) ("As the United States are not suable of common right, the party who institutes a suit against them must bring his case within the authority of some act of congress, or the court cannot exercise

14

jurisdiction."). This feature of sovereign immunity does not warrant reconsideration of its jurisdictional status.

Nothing inherent in the nature of subject-matter jurisdiction precludes it from depending on a defendant's choice. The Foreign Sovereign Immunities Act expressly provides that a foreign state may waive its sovereign immunity and thereby allow a court to exercise subject-matter jurisdiction over the suit against it. *See* 28 U.S.C. § 1605(a)(1) ("A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... in which the foreign state has waived its immunity either explicitly or by implication."); *see also id.* § 1330(a) (conditioning a court's "original jurisdiction" over "any nonjury civil action against a foreign state" on "the foreign state ... not [being] entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement"); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 489 (1983) (confirming that § 1330(a) governs a court's "exercise [of] subject matter jurisdiction"). Jurisdictional limitations do not generally depend on a party's consent, but there is no principled reason why such rules cannot.[7]

The cases the court cites for a contrary argument stand for the unremarkable proposition that the absence of a claim of tribal

---

[7] In a similar way, Congress has conditioned a federal court's exercise of removal jurisdiction on the unanimous consent of all defendants. *See* 28 U.S.C. § 1441(a) (allowing defendants to remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction ... to [a] district court of the United States"); *id.* § 1446(b)(2)(A) ("When a civil action is removed solely under section 1441(a), all defendants who have been properly joined and served must join in or consent to the removal of the action."). Thus, whether a federal court may exercise removal jurisdiction depends on the consent of each defendant.

immunity, like the presence of such a claim, does not in and of itself create subject-matter jurisdiction. *See Oklahoma Tax Comm'n v. Graham*, 489 U.S. 838, 841 (1989) ("The possible existence of a tribal immunity defense, then, did not convert Oklahoma tax claims into federal questions, and there was no independent basis for original federal jurisdiction to support removal."). But that does not mean a tribe's proper assertion of its immunity does not deprive a court of subject-matter jurisdiction. The defendant's lack of immunity to suit is a necessary but not sufficient condition for the exercise of subject-matter jurisdiction. Because the court's discussion of this point is dicta and is erroneous, I do not join it.

### III

The court's opinion "assum[es]" that "equitable defenses beyond those described in *Sherrill* [a]re available." *Ante* at 20. I would hold that the *Sherrill* equitable defense is the only equitable defense available against a tribal claim to land that was allegedly transferred or abandoned long ago. Phillips's other equitable defenses are therefore barred as a matter of law.

In *City of Sherrill v. Oneida Indian Nation of N.Y.*, the Supreme Court devised a federal common-law equitable defense to a tribe's claim of ownership to lands that it had allegedly sold without authorization two centuries earlier. 544 U.S. 197 (2005). The Court said this equitable defense considers whether there is a "longstanding, distinctly non-Indian character of the [disputed land] and its inhabitants," whether there has been "regulatory authority constantly exercised by [the state] and its counties and towns," and whether there was a "long delay in seeking judicial relief against" the current holder or prior holders. *Id.* at 202.

16

This court has subsequently labeled this defense "the *Sherrill* equitable defense," *Stockbridge-Munsee Cmty. v. New York*, 756 F.3d 163, 166 (2d Cir. 2014), and has held that in such cases we should "consider[] only factors equivalent to those addressed in *Sherrill*," which itself "did not involve the application of a traditional laches defense so much as an equitable defense that drew upon laches and other equitable doctrines but that derived from general principles of 'federal Indian law and federal equity practice,'" *Oneida Indian Nation of N.Y. v. County of Oneida*, 617 F.3d 114, 128 (2d Cir. 2010) (quoting *Sherrill*, 544 U.S. at 213). Our analysis indicates that "the *Sherrill* equitable defense" is a *sui generis* defense that displaces traditional equitable defenses, *Stockbridge-Munsee*, 756 F.3d at 166, including those defenses based on state law, *see Oneida Indian Nation*, 617 F.3d at 128 (noting that the *Sherrill* equitable defense is not satisfied simply because "the elements of a traditional laches defense [are] met").

Moreover, recognition of additional equitable defenses in the context of tribal claims to ancient lands would contravene the Nonintercourse Act, which provides that any conveyance of tribal land is of no "validity in law or equity" unless made pursuant to a "treaty or convention" with the United States. 25 U.S.C. § 177; *see also Oneida Indian Nation of N.Y. State v. Oneida County*, 414 U.S. 661, 670 (1974) ("The rudimentary propositions that Indian title is a matter of federal law and can be extinguished only with federal consent apply in all of the States, including the original 13.").

The court's opinion correctly concludes that Phillips cannot satisfy the *Sherrill* equitable defense factors here. Rather than reach the merits of his other equitable defenses, I would hold that *Sherrill* bars those other defenses as a matter of law.

* * *

 The court errs in holding that tribal sovereign immunity bars Phillips's counterclaim, in suggesting that tribal sovereign immunity does not affect a court's subject-matter jurisdiction, and in considering affirmative defenses beyond the *Sherrill* equitable defense. But Phillips's counterclaim fails on the merits, the court's dicta about the nature of sovereign immunity are irrelevant to the disposition of this case, and Phillips cannot establish the *Sherrill* equitable defense. Accordingly, I concur in the court's judgment.