# United States Court of Appeals
## For the First Circuit

Nos. 19-1661, 19-1857

AQUINNAH/GAY HEAD COMMUNITY ASSOCIATION, INC.;
TOWN OF AQUINNAH,

Plaintiffs, Appellees/Cross-Appellants,

COMMONWEALTH OF MASSACHUSETTS,

Plaintiff, Appellee,

v.

THE WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH);
THE AQUINNAH WAMPANOAG GAMING CORPORATION;
THE WAMPANOAG TRIBAL COUNCIL OF GAY HEAD, INC.,

Defendants, Appellants/Cross-Appellees,

CHARLIE BAKER, in his official capacity as Governor of the
Commonwealth of Massachusetts; MAURA HEALEY, in her capacity
As Attorney General of the Commonwealth of Massachusetts;
CATHY JUDD-STEIN, in her capacity as Chair of the
Massachusetts Gaming Commission,

Third Party Defendants, Appellees.

Nos. 19-1729, 19-1922

AQUINNAH/GAY HEAD COMMUNITY ASSOCIATION, INC.;
TOWN OF AQUINNAH,

Plaintiffs, Appellees/Cross-Appellants,

COMMONWEALTH OF MASSACHUSETTS,

Plaintiff, Appellee,

v.

THE WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH);
THE AQUINNAH WAMPANOAG GAMING CORPORATION;
THE WAMPANOAG TRIBAL COUNCIL OF GAY HEAD, INC.,

Defendants, Appellants/Cross-Appellees,

CHARLIE BAKER, in his official capacity as Governor of the
Commonwealth of Massachusetts; MAURA HEALEY, in her capacity
as Attorney General of the Commonwealth of Massachusetts;
CATHY JUDD-STEIN, in her capacity as Chair of the
Massachusetts Gaming Commission,

Third Party Defendants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

---

Before

Thompson and Kayatta,[*]
Circuit Judges.

---

Scott D. Crowell, with whom Crowell Law Office-Tribal
Advocacy Group LLP, Lael R. Echo-Hawk, MThirtySix, PLLC, Bruce
Singal, Elizabeth McEvoy, and Donoghue, Barrett & Singal were on
brief, for appellants/cross-appellees.
Daniel D. Lewerenz, Native American Rights Fund, Derrick
Beetso, National Congress of American Indians, Gregory A. Smith,
and Hobbs Straus Dean & Walker, LLP, on brief for NCAI Fund and
USET Sovereignty Protection Fund, amici curiae.
William M. Jay, with whom Douglas J. Kline, Joshua J. Bone,
Goodwin Procter LLP, Felicia H. Ellsworth, Claire M. Specht, Wilmer
Cutler Pickering Hale and Dorr LLP, Ronald H. Rappaport, Michael
A. Goldsmith, and Reynolds, Rappaport, Kaplan & Hackney, LLC were
on brief, for appellees/cross-appellants Aquinnah/Gay Head
Community Association, Inc. and Town of Aquinnah.

---

[*] Judge Torruella heard oral argument in these matters and
participated in the semble, but he did not participate in the
issuance of the panel's decision. The remaining two panelists
therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

Brian M. Hurley, Stacie A. Kosinski, and Rackemann Sawyer & Brewster, P.C., on brief for Martha's Vineyard Commission, amicus curiae.

February 25, 2021

**THOMPSON, Circuit Judge.** The Wampanoag Tribe of Gay Head (Aquinnah),[1] the Wampanoag Tribal Council of Gay Head, Inc., and the Aquinnah Wampanoag Gaming Corporation (collectively, the "Tribe") plan to build a gaming facility on the Tribe's trust lands in Dukes County, Massachusetts. The Commonwealth of Massachusetts, the Town of Aquinnah, and the Aquinnah/Gay Head Community Association[2] have sought at times to halt this development, at least until the Tribe complies with certain Commonwealth and municipal regulations they believe are applicable. The disputes that have arisen involve complicated issues relating to a federal statute known as the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721. We resolved some of the issues about IGRA involving these parties just a few years ago in Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah), 853 F.3d 618 (1st Cir. 2017) (Wampanoag I). The main question before us now, however, is not primarily about IGRA, but whether a party who did not raise a particular issue in that first appeal, though it could have, may do so on a successive appeal. Because

---

[1] The town of Gay Head was renamed "Aquinnah" at some point after its incorporation into the Commonwealth of Massachusetts.

[2] The Community Association is a Massachusetts not-for-profit corporation whose mission is, among other things, "to encourage historic and environmental preservation in the Town" and "to ensure the effective enforcement of all municipal laws and regulations."

we have previously explained that a party may not, absent exceptional circumstances, and because those exceptional circumstances are not present here, we affirm the judgment of the district court.

## I.  Background

We laid out much of the background to the present dispute more fully in Wampanoag I, but we recap the pertinent parts here and supplement them as necessary.

### A.  Setting the Stage: the Settlement Act and IGRA

In the 1980s, the parties entered into an agreement conveying roughly 485 acres of land (the "Settlement Lands") to the Tribe.  The agreement required Congress to implement it, which it did through the passage of the Settlement Act.  See Wampanoag Tribal Council of Gay Head, Inc., Indian Claims Settlement Act of 1987, Pub. L. No. 100-95, 101 Stat. 74 (formerly codified at 25 U.S.C. §§ 1771-1771i).  In pertinent part, the Settlement Act provides that the Settlement Lands "shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth . . . and the [T]own . . . (including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance)."  25 U.S.C. § 1771g.

Soon after the passage of the Settlement Act, Congress enacted IGRA which "creates a framework for regulating gaming

activity on Indian lands" that distinguishes between different types of gaming. <u>Michigan</u> v. <u>Bay Mills Indian Cmty.</u>, 572 U.S. 782, 785 (2014). The type of gaming the Tribe wishes to pursue, Class II gaming, consists of bingo and certain card games. 25 U.S.C. § 2703(7)(A).[3] IGRA explains that Class II gaming on Indian lands "shall continue to be within the jurisdiction of the Indian tribes," <u>id.</u> § 2710(a)(2), but it allows a tribe to partake in Class II gaming on its lands, in pertinent part, only if that gaming is located within a state that "permits such gaming for any purpose by any person, organization or entity (and such gaming is not otherwise specifically prohibited on Indian lands by Federal law)," <u>id.</u> § 2710(b)(1). The Commonwealth is one such state. <u>See</u> <u>Wampanoag I</u>, 853 F.3d at 622–23, 629.

<u>Wampanoag I</u> trained on the interplay between these two federal statutes -- the Settlement Act and IGRA -- and we detail how that dispute, and correspondingly this one, arose.

**B.  The Commonwealth's Complaint and <u>Wampanoag I</u>**

In December 2013, after the Tribe informed the Commonwealth that it was going to establish a Class II gaming

---

[3] Class I gaming consists primarily of "traditional forms of Indian gaming engaged in by individuals . . . in connection with[] tribal ceremonies or celebrations." 25 U.S.C. § 2703(6). Class III gaming consists of all forms of gaming outside classes I and II. <u>Id.</u> § 2703(8).

facility under IGRA on the Settlement Lands, the Commonwealth brought suit against the Tribe in state court, seeking a declaratory judgment that the Tribe had "no right to license, open, or operate a gaming establishment on the Settlement Lands without complying with all laws of the Commonwealth pursuant to the terms of the [pre-Settlement Act agreement]." In particular, the Commonwealth contended that the Tribe needed a gaming license from the Massachusetts Gaming Commission before the Tribe could operate a gaming establishment on its lands. The Tribe maintained that it did not need to acquire a gaming license because IGRA impliedly repealed the portion of the Settlement Act which subjected gaming activity on the Settlement Lands to the "civil and criminal laws, ordinances, and jurisdiction of the Commonwealth." We refer to this as the "gaming issue."

The Tribe removed the case to federal district court, and later, the district court entered summary judgment for the Commonwealth and denied summary judgment for the Tribe.[4] The district court determined that IGRA did not apply because the Tribe had not met its burden of demonstrating that it exercised sufficient "governmental power" over the Settlement Lands as IGRA requires, and that, even if it did, IGRA did not impliedly repeal

_____

[4] It also granted summary judgment for the Town and the Community Association. More on this in a bit.

the portion of the Settlement Act at issue. The district court subsequently issued a final judgment, which provided a declaration that "the Tribe may not construct, license, open, or operate any gaming facility at or on the Settlement Lands . . . without complying with the laws and regulations of the Commonwealth . . . and the Town . . . , including any pertinent state and local permitting requirements," and it issued a permanent injunction to that effect.

The Tribe then appealed from the district court's final judgment, asking us to resolve the two questions the district court had resolved against it: "whether IGRA applies to the Settlement Lands" and "whether IGRA effects a repeal of the [Settlement] Act." Wampanoag I, 853 F.3d at 624. In contrast to the district court, we determined that IGRA did apply to the Settlement Lands and that IGRA did effect a partial repeal of the Settlement Act. Id. at 624-29. Accordingly, our mandate reversed the opinion of the district court and remanded the case "for entry of judgment in favor of the Tribe." Id. at 629.

## C. The Town and the Community Association's Complaints and the Preliminary Injunction

That is not the entire story, though, because the Commonwealth was not alone in seeking to curtail the Tribe's plans. What we described in Wampanoag I as "some procedural fencing not relevant" to that appeal is quite relevant to this one, so we fill

-8-

in some of the gaps in the procedural history we have laid out so far.  Wampanoag I, 853 F.3d at 623.

Back towards the beginning of the litigation, after the Tribe removed the case to federal district court, that court permitted the Town and the Community Association to intervene and to file their own complaints.  The Town sought a declaration, among other things, that, "pursuant to the [pre-Settlement Act agreement], the Tribe may only engage in gaming activity after properly complying with all pertinent regulatory, permitting, and licensing requirements -- including all local zoning ordinances."  The Community Association sought a similar declaration as well as an injunction to that effect.  The Tribe argued that such requirements were integral to gaming conducted by the Tribe, and therefore that IGRA impliedly repealed the portion of the Settlement Act requiring the Tribe to comply with them.  We refer to this as the "permitting issue."

At the same time the Commonwealth and the Tribe sought summary judgment, so too did the Town and the Community Association.  While all those motions were pending, the Tribe apparently began efforts to refashion one of its buildings into a casino.  In response, the Town sought a preliminary injunction prohibiting the Tribe from undertaking any further construction on the building pending the results of the summary judgment motions.

The Commonwealth and the Community Association filed memoranda in support of the Town's motion.  Following a hearing, the district court granted the Town's motion for a preliminary injunction.

The district court explained that it saw the preliminary injunction issue as "very narrow," not about "whether [IGRA] preempts the Settlement Act, [or] whether it preempts state laws or town zoning but rather whether the [T]ribe can build a building without applying for a building permit and getting the required inspections along the way and ultimately an occupancy permit." The district court explained that in its view, "[t]he rules are that you need a building permit to construct a building," a requirement that "will remain in place regardless of the outcome of the gaming aspect of this case."  The district court further explained, "if the tribe is going to do any work on the building, construction work, it's going to have to obtain a building permit and comply with all of the construction and wiring and plumbing code requirements and to permit inspections and to obtain an occupancy permit before opening it to the public."  According to the district court, those requirements were "of general applicability," were "for public health and safety," and were "independent of the gaming issue generally and the zonings issue specifically as it applies to casino gaming."

The preliminary injunction remained in effect until the district court resolved the parties' cross-motions for summary judgment. The district court then entered the final judgment that was the subject of Wampanoag I. The final judgment did not pertain only to the gaming issue but stated it was "consistent with" the district court's previous orders, including the preliminary injunction. As a reminder, the final judgment included a declaration that "the Tribe may not construct, license, open, or operate any gaming facility at or on the Settlement Lands . . . without complying with the laws and regulations of the Commonwealth . . . and the Town . . . , including any pertinent state and local permitting requirements," and it contained a permanent injunction to that effect.

## D.  Post-Wampanoag I

With the procedural history prior to Wampanoag I in place, we turn to what happened in Wampanoag I's aftermath. We issued our judgment in Wampanoag I on April 10, 2017. Over a year later, in May 2018, after the Supreme Court denied petitions for certiorari, our mandate issued. Nearly one year after that, in April 2019, the Town moved for entry of its proposed final judgment, which in pertinent part would permanently enjoin the Tribe "from constructing any gaming facility at any location within the Town of Aquinnah, including on the Settlement Lands, without

-11-

first complying with all generally applicable permitting requirements of the Town of Aquinnah and the Commonwealth of Massachusetts, including but not limited to all building permit requirements of the Town of Aquinnah." The Community Association filed a memorandum in support.

On June 19, 2019, the district court entered an amended final judgment in favor of the Tribe as to the gaming issue but against the Tribe as to the permitting issue.[5] In doing so, the district court explained its view that, in Wampanoag I, the Tribe had not appealed the permitting issue (i.e., whether IGRA impliedly repealed the Settlement Act as to non-gaming laws) and therefore that Wampanoag I did not speak to it. Accordingly, it found that the Tribe had forfeited or waived the issue.

The Tribe timely appealed.[6]

_____

[5] The district court subsequently amended the judgment twice more in ways not relevant to this appeal.

[6] The Town and the Community Association filed a cross-appeal "for the sole purpose of preserving for potential further review their argument -- as briefed in the prior appeal -- that IGRA did not repeal the Settlement Act's grant of gaming jurisdiction." The Town and the Community Association wisely do not ask us to reconsider Wampanoag I, assuring us that we "need not address the cross-appeal at all." At this juncture, reconsidering Wampanoag I would be "beyond our prerogatives." Ackerley Commc'ns of Mass., Inc. v. City of Cambridge, 135 F.3d 210, 217 n.10 (1st Cir. 1998); see also United States v. Barbosa, 896 F.3d 60, 74 (1st Cir. 2018) (explaining that if it were otherwise, "the finality of appellate decisions would be threatened and every decision, no matter how thoroughly researched or how well-reasoned, would be open to

-12-

## II.  Analysis

The Tribe raises a bevy of challenges to the district court's amended final judgment.  The Tribe first contends that the district court erred by incorrectly determining that the Tribe had waived the permitting issue.  The Tribe then argues that, regardless of whether it waived the permitting issue, the district court, as a procedural matter, lacked authority to enter the amended final judgment.  Because our precedent compels us to reject both of the Tribe's substantive arguments, we then ask whether this is one of those rare cases where we may overlook a party's waiver.

### A.  Waiver

In determining whether the Tribe waived the permitting issue, the law-of-the-case doctrine is key.  We have described the doctrine as having two branches, and both are at play.  See United States v. Matthews, 643 F.3d 9, 13 (1st Cir. 2011).  The first branch, sometimes referred to as the mandate rule, "prevents relitigation in the trial court of matters that were explicitly or implicitly decided by an earlier appellate decision in the same case."  Id. (quoting United States v. Moran, 393 F.3d 1, 7 (1st Cir. 2004)).  The second branch requires a "successor appellate

_____

continuing intramural attacks").

-13-

panel in a second appeal in the same case" to adhere to the earlier panel's decision. Id. (quoting Moran, 393 F.3d at 7). This branch "bars a party from resurrecting issues that either were, or could have been, decided on an earlier appeal." Id. at 12-13 (citing United States v. Connell, 6 F.3d 27, 30 (1st Cir. 1993)); see also 18B Edward H. Cooper, Federal Practice and Procedure § 4478 n.34 (2d ed. 2020) ("Although an issue neither presented nor decided should not be treated as law of the case because it should have been presented earlier, it is common to enforce waiver, and almost as common to describe the waiver as a law-of-the-case principle.").

The Tribe relies on the first branch while trying to sidestep the second. The Tribe claims that this court resolved the permitting issue in Wampanoag I in the Tribe's favor. Accordingly, the Tribe argues the first branch of the law-of-the-case doctrine required the district court to respect that decision (which it failed to do) and that the second branch requires us too to respect Wampanoag I's decision on the permitting issue. We review whether the law-of-the-case doctrine applies de novo. Matthews, 643 F.3d at 13.

As we have detailed above, the Tribe previously appealed aspects of the district court's final judgment, and we resolved those aspects in favor of the Tribe. The Tribe's appeal -- and, correspondingly, our opinion -- focused solely on the gaming issue.

-14-

The Tribe argues that, in Wampanoag I, it appealed from the district court's final judgment "in its entirety . . . , which included the language enjoining the Tribe from proceeding without local building permits." True, a party's notice of appeal from a final judgment also appeals from all interlocutory orders issued prior to the final judgment. Denault v. Ahern, 857 F.3d 76, 81-82 (1st Cir. 2017). But a party's opening brief clarifies the appeal's scope. See Piazza v. Aponte Roque, 909 F.2d 35, 37 (1st Cir. 1990) (explaining that the "statement of the issues presented for review and the contentions of the appellant with respect to the issues presented" in an appellant's brief "inform[] the appellee of the scope of the appeal"). The Tribe's opening brief in Wampanoag I clearly focused on only the gaming issue. Indeed, the Tribe's statement of the issues presented for review trained on the "application of the Commonwealth's gaming laws." See Fed. R. App. P. 28(a)(5). The Tribe never asked us to consider the permitting issue, nor did it mention the preliminary injunction, which had addressed the permitting issue head on, beyond a single footnote.

"It should go without saying that we deem waived claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument." Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175 (1st Cir. 2011). We do not ordinarily address waived

-15-

claims. See Vázquez-Rivera v. Figueroa, 759 F.3d 44, 46-47 (1st Cir. 2014) (deeming waived and therefore declining to review issues not briefed, even where appellant's "notice of appeal signaled his intent to challenge" them); see also Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc., 925 F.2d 6, 10 (1st Cir. 1991) (declining to address an issue where appellant had not raised it in its brief and where the appellant "ha[d] not included it in the statements of issues presented by [appellant] as required by" the Federal Rules of Appellate Procedure).

As the Tribe did not address the permitting issue in its opening brief in Wampanoag I, we likewise did not address it in our opinion. See Diaz v. Jiten Hotel Mgmt., Inc., 741 F.3d 170, 176 (1st Cir. 2013) ("Our opinion . . . cannot plausibly be read to have conclusively determined [an issue], particularly when [that issue] was neither challenged nor briefed on appeal."). We frequently discussed whether the Tribe needed to obtain a gaming license (i.e., the gaming issue) without ever discussing whether the Tribe needed to, for example, obtain various building permits (i.e., the permitting issue). See Wampanoag I, 853 F.3d at 623, 629. Further, as we mentioned when we laid out the procedural history of the case, we -- like the Tribe -- did not discuss the district court's preliminary injunction; instead, for purposes of Wampanoag I, we at most alluded to it as "some procedural fencing

-16-

not relevant" to the appeal. Id. at 623. All said, we agree with the district court's assessment that "[t]here is no question that [we] did not expressly decide the [permitting] issue" in Wampanoag I. Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah), 390 F. Supp. 3d 183, 189 (D. Mass. 2019).

The Tribe suggests that even if it did not expressly address the permitting issue in Wampanoag I, the Tribe did so implicitly in its Wampanoag I brief when it referred to "gaming laws." See, e.g., Appellants' Br., Wampanoag I, No. 16-1137, 2016 WL 3437627, at *3 ("The crux of this appeal is . . . whether Congress' enactment of IGRA . . . impliedly repealed those provisions in [the Settlement Act], which had applied the gaming laws and regulations of the Commonwealth to Aquinnah Indian lands."). According to the Tribe, it did not waive the permitting issue, because the term "gaming laws" as used in its brief was a "contextual reference to IGRA's comprehensive and sophisticated regulatory scheme" and therefore encompassed even laws not specifically related to gaming. We are not convinced that the Tribe's use of "gaming laws" actually encompassed non-gaming laws which may incidentally touch on gaming. The Tribe did not, as it does now, include any arguments as to the scope of IGRA's implied repeal of the Settlement Act, which might have suggested that it was intending to appeal the permitting issue. Nor did the Tribe's

-17-

brief, despite leaning heavily on one of our circuit's seminal cases in this area, ever cite or reference a crucial portion of that opinion which suggested that whether certain activities are regulable may depend on whether they are "deemed integral to gaming." Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 705 (1st Cir. 1994). Moreover, we note that the Tribe consistently referred to the "Commonwealth's gaming laws," not to the regulations of the Town, such as those relating to permitting. See Appellants' Br., Wampanoag I, No. 16-1137, 2016 WL 3437627, at *2, *10, *14, *20, *21. Given how squarely the permitting issue was contested before the district court, staying silent on the issue in Wampanoag I is irreconcilable with what is being argued now.

Next, the Tribe contends that even if it waived the permitting issue on appeal, this court should hear the Tribe's arguments on the merits because the district court made significant and novel modifications in the amended final judgment. According to the Tribe, the district court "manufactured for the very first time" in the post-Wampanoag I final judgment "its own alternative definition of 'gaming laws' to mean only those state statutes and local regulations that prohibit or regulate games of chance, and not to mean general regulatory laws and regulations." In other words, the Tribe suggests (in the alternative) that it could not

-18-

have appealed the permitting issue in <u>Wampanoag I</u> since the district court only pronounced the relevant distinction between the permitting issue and the gaming issue after we decided <u>Wampanoag I</u>. But this argument is belied by the district court's pre-<u>Wampanoag I</u> orders, especially the preliminary injunction order which was incorporated into the original final judgment, where the district court employed this distinction.[7] Thus, the Tribe was on notice before its prior appeal that the district court had distinguished between gaming laws and general regulatory laws.

Finally, the Tribe argues that the district court could not possibly have found waiver of the permitting issue because of the Tribe's sovereign immunity, which it says prevented the district court from making any decision on the issue (even that the Tribe had waived the issue). Sovereign immunity means that, "[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." <u>Kiowa Tribe of Okla.</u> v. <u>Mfg. Techs., Inc.</u>, 523 U.S. 751, 754 (1998); <u>see</u> <u>Bay Mills Indian Cmty.</u>, 572 U.S. at 788-89, 791 & n.4. Even though the Tribe has not always pressed the

---

[7] Indeed, the key passage the Tribe relies on to suggest that the district court originally "understood" this case only to concern gaming laws comes from an opinion issued by the district court before the Town and the Community Association even intervened and filed their complaints.

argument that it has retained its sovereign immunity from suit, the Tribe tells us that it cannot have waived the argument because sovereign immunity implicates the court's subject-matter jurisdiction and therefore cannot be waived. See Sebelius v. Auburn Reg'l Med. Ctr., 568 U.S. 145, 153 (2013) ("Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy."); cf. Larson v. United States, 274 F.3d 643, 648 (1st Cir. 2001) (per curiam) ("Sovereign immunity [of the federal government] . . . is a jurisdictional defense that may be raised for the first time in the court of appeals.").

There is some "divergence of opinion as to the precise nature of tribal sovereign immunity" and whether it is "synonymous" with subject-matter jurisdiction. Oneida Indian Nation v. Phillips, 981 F.3d 157, 170-71 (2d Cir. 2020); see id. at 171 n.70 (collecting cases); id. at 175-180 (Menashi, J., concurring in part and concurring in the judgment); see also Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth., 207 F.3d 21, 28 (1st Cir. 2000) ("[A]lthough tribal sovereign immunity is jurisdictional in nature, consideration of that issue always must await resolution of the antecedent issue of federal subject-matter jurisdiction."). Although subject-matter jurisdiction can never be waived or forfeited, Gonzalez v. Thaler, 565 U.S. 134, 141

(2012), as we have explained, tribal sovereign immunity can be waived through tribal conduct, provided that "such actions [are] clear and unequivocal in their import," Narragansett Indian Tribe v. Rhode Island, 449 F.3d 16, 25 (1st Cir. 2006) (en banc). Even assuming that tribal sovereign immunity is synonymous with subject-matter jurisdiction, but see Ninigret, 207 F.3d at 28, we find waiver of tribal sovereign immunity here.

Early in this case, the Tribe pressed a different sovereign immunity argument before the district court, which the district rejected by advertence to a decision from the Massachusetts Supreme Judicial Court. There, the Supreme Judicial Court had determined that the Tribe waived sovereign immunity in relevant respects through its pre-Settlement Act agreement with the Commonwealth, the Town, and the Community Association. Bldg. Inspector & Zoning Officer v. Wampanoag Aquinnah Shellfish Hatchery Corp., 818 N.E.2d 1040, 1042-43, 1048-51 (Mass. 2004). The federal district court gave that decision full faith and credit, see 28 U.S.C. § 1738, and held that it precluded the Tribe from contesting the waiver of sovereign immunity in this case. Massachusetts v. Wampanoag Tribe of Gay Head, 98 F. Supp. 3d 55, 62-67 (D. Mass. 2015).

The Tribe maintains for the first time now, however, that IGRA impliedly repealed the pre-Settlement Act agreement

between the parties at least as to the Tribe's gaming activities, such that it wiped away the Tribe's waiver of sovereign immunity in that domain.[8] Put differently, the Tribe says that Congress, through IGRA, undid the Tribe's waiver of sovereign immunity, at least as to suits stemming from the Tribe's gaming activities. Because the Tribe asserts that complying with the local permitting regulations is related to gaming, the Tribe maintains that it cannot be sued (absent a new waiver) unless we disagree that those regulations are related to gaming. Resolving this threshold matter would effectively require us to resolve the permitting issue the Tribe wants us to decide on the merits: whether IGRA impliedly repealed the portion of the Settlement Act requiring the Tribe's compliance with those regulations.

We are not detained by this argument. We recall that "[a]n Indian tribe's sovereign immunity may be limited by either tribal conduct (i.e., waiver or consent) or congressional enactment (i.e., abrogation)." Narragansett Indian Tribe, 449

---

[8] The Tribe also suggests that the Tribe was not a party to the pre-Settlement Act agreement because the Tribe had not been formally recognized by the federal government at the time. But "the Tribe is mistaken in its professed belief that it lacked jurisdictional power at the time of the Settlement Act." Narragansett, 19 F.3d at 694. "The Tribe's retained sovereignty predates federal recognition -- indeed, it predates the birth of the Republic." Id.

F.3d at 25 (emphases added) (citing Kiowa, 523 U.S. at 754); see also South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 343 (1998) ("Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights."); 1 Felix S. Cohen, Handbook of Federal Indian Law § 7.05 (Nell Jessup Newton ed., 2017) ("Although there used to be some uncertainty about whether tribes could waive their own sovereign immunity without congressional approval, it is now clear that Indian nations can . . . ." (footnote omitted)); United States v. Oregon, 657 F.2d 1009, 1013 (9th Cir. 1981) (explaining that courts had at one point "expressed doubts on the ability of Indian tribes to waive immunity"). We have never encountered the Tribe's seemingly novel argument that a congressional enactment can undo or override a tribe's voluntary waiver of sovereign immunity through tribal conduct. We need not resolve that question now, however, because even if Congress could and did restore the sovereign immunity from suit that the Tribe may have waived through the pre-Settlement Act agreement, we would still find the Tribe had waived its immunity here through its litigation conduct.

As discussed, the Tribe raised a variant of its sovereign immunity argument in the district court prior to Wampanoag I, and the district court permitted the suit to proceed. The Tribe later appealed to us without advancing on appeal a challenge to the

district court's adverse ruling on the sovereign immunity issue. We resolved the merits of that case in the Tribe's favor. Now the Tribe, dissatisfied with implications of Wampanoag I it may not have considered, wants to press rewind. The Supreme Court, however, has looked unfavorably on a sovereign's attempts to "regain immunity" even after it "litigated and lost a case brought against it in federal court." Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 622 (2002).

We recognize that the sovereign in Lapides was a state, not a tribe, and that a tribe's sovereign immunity "is not congruent" with that of a state. Three Affiliated Tribes of Fort Berthold Rsrv. v. Wold Eng'g, 476 U.S. 877, 890 (1986). We are also mindful that some courts of appeals have held that Lapides' reasoning -- at least insofar as it held that a state's removal to federal court can constitute waiver -- "does not apply at all in the context of tribal immunity." Bodi v. Shingle Springs Band of Miwok Indians, 832 F.3d 1011, 1020 (9th Cir. 2016); see also Contour Spa at the Hard Rock, Inc. v. Seminole Tribe of Fla., 692 F.3d 1200, 1206 (11th Cir. 2012). But here, the Tribe's conduct went beyond merely removing a case to federal court like the tribes' conduct in the cases addressed by our sister circuits. Contra Bodi, 832 F.3d at 1020, 1022 (rejecting specifically "Lapides's waiver-through-removal reasoning" in the tribal

-24-

immunity context, and noting that Lapides's reasoning concerned the "selective use of 'immunity' to achieve litigation advantages" (quoting Lapides, 535 U.S. at 620)); Contour Spa, 692 F.3d at 1201 (rejecting application of Lapides, in part, because "the problems of inconsistency and unfairness that were inherent in the procedural posture of Lapides are absent here").  We think a tribe cannot raise the issue of sovereign immunity in a district court, forgo it on appeal while seeking relief from an adverse ruling, and then employ it in a later appeal to secure a do-over.  Cf. In re Greektown Holdings, LLC, 917 F.3d 451, 464 (6th Cir. 2019) (reasoning that "Indian tribes can waive their tribal sovereign immunity through sufficiently clear litigation conduct, including by filing a lawsuit"), cert. dismissed, 140 S. Ct. 2638 (2020); cf. also Rupp v. Omaha Indian Tribe, 45 F.3d 1241, 1245 (8th Cir. 1995) ("We will not transmogrify the doctrine of tribal immunity into one which dictates that the tribe never loses a lawsuit."); United States v. Oregon, 657 F.2d at 1014 ("Otherwise, tribal immunity might be transformed into a rule that tribes may never lose a lawsuit.").  Accordingly, we find that the Tribe waived any retained sovereign immunity from suit with respect to challenges to jurisdiction over the Tribe's gaming activities on the

Settlement Lands when the Tribe failed to address it in the Wampanoag I appeal.[9]

## B. Procedural Authority

The Tribe argues that, regardless of whether the Tribe waived the permitting issue, the district court impermissibly entered the post-remand final judgment because it lacked authority to do so. Our mandate from Wampanoag I lodged in the district court's docket on May 9, 2018. The Tribe notes that the Federal Rules of Civil Procedure provide, as relevant here, that judgment is considered entered at the latest after "150 days have run from" its entry in the civil docket. Fed. R. Civ. P. 58(c)(2)(B). The

---

[9] The Tribe also contends that, even if it waived the permitting issue, the district court erred by declining to reconsider its injunction as to the permitting issue after the remand from Wampanoag I, as the Tribe requested. By seeking reconsideration, the Tribe says that it "preserved the substantive issue on this appeal for review." That is, quite simply, not how it works: "[A] timely appeal from an order denying a motion for reconsideration brought other than in conformity with Rule 59(e) does not 'resurrect [the appellant's] expired right to contest the merits of the underlying judgment, nor bring the judgment itself before [the court of appeals] for review.'" Air Line Pilots Ass'n v. Precision Valley Aviation, Inc., 26 F.3d 220, 224 (1st Cir. 1994) (second and third alterations in original) (quoting Rodriguez-Antuna v. Chase Manhattan Bank Corp., 871 F.2d 1, 2 (1st Cir. 1989)). There is no question the Tribe's motion did not conform with Rule 59(e). Although an appeal may still lie from the denial itself of a motion for reconsideration, see id. at 223, we review such a denial for abuse of discretion and, as we will later explain, the Tribe has failed to show that the district court "committed a manifest error of law." Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006).

Tribe also points to a Massachusetts federal court rule, which provides that "[a]n order or judgment of an appellate court in a case appealed from this court shall, if further proceedings are not required, become the order or judgment of this court and be entered as such on receipt of the mandate of the appellate court." D. Mass. Local R. 58.2(d). Because, according to the Tribe, no further proceedings were required after our mandate issued, and because the Town did not even move for entry of the amended final judgment until well after 150 days after that, the Tribe maintains that the Wampanoag I mandate barred the district court from entering its amended final judgment.

We have explained that "Rule 58(c) details when a judgment has entered, if timing is the only question, but it does not address whether a judgment has entered, when the issue implicates more than timing." Bos. Prop. Exch. Transfer Co. v. Iantosca, 720 F.3d 1, 7 (1st Cir. 2013). Such is the case here. See also Bankers Tr. Co. v. Mallis, 435 U.S. 381, 385 n.6 (1978) (per curiam) (explaining that, for purposes of appellate jurisdiction, "the courts of appeals must . . . determine whether the district court intended the judgment to represent the final decision in the case"); Baez v. Comm'r of Soc. Sec., 760 F. App'x 851, 854 (11th Cir. 2019) (unpublished) ("[J]udgment is entered when the district court enters what it intends to be its final

-27-

order on the docket and 150 days pass . . . ." (footnote omitted)). Because our mandate required more of the district court than the mere logging of our mandate in the district court's docket, we think the amended final judgment entered when the district court actually said it was entering it.

Determining what the mandate required from the district court and whether further proceedings were necessary depends on what we decided (and what we did not decide) in Wampanoag I. While, subject to a few exceptions, "[a]n appellate court's mandate controls all issues that were actually considered and decided by the appellate court, or as were necessarily inferred from the disposition on appeal," "issues that were not decided by the appellate court . . . are not affected by the mandate." Kashner Davidson Sec. Corp. v. Mscisz, 601 F.3d 19, 23-24 (1st Cir. 2010) (alteration in original) (first quoting NLRB v. Goodless Bros. Elec. Co., 285 F.3d 102, 107 (1st Cir. 2002); and then quoting de Jesús-Mangual v. Rodríguez, 383 F.3d 1, 6 (1st Cir. 2004)).

The mandate in Wampanoag I merely stated: "The district court's judgment is reversed, and the matter is remanded to the district for entry of judgment in favor of the tribe." If, as the Tribe contends, this mandate left nothing to be done on remand, we would have a different case. But in Wampanoag I, as we have already explained, we only resolved whether IGRA impliedly

repealed the Settlement Act with respect to the gaming issue, not the permitting issue. Further proceedings were necessary for the district court to modify its injunction to reflect this change. Under the Federal Rules of Civil Procedure, "[e]very order granting an injunction" must state its "terms specifically," describing "in reasonable detail -- and not by referring to the complaint or other document -- the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B)-(C). An order failing to do so "should be set aside on appeal." Francisco Sánchez v. Esso Standard Oil Co., 572 F.3d 1, 15 (1st Cir. 2009). Accordingly, the district court had to delineate which portions of the injunction were altered by Wampanoag I (i.e., those pertaining to the gaming issue) and which were not.

The Tribe tries to rebut this contention by arguing that the mandate clearly affected both the gaming and permitting issues and therefore that entry in favor of the Tribe left nothing for the district court to enjoin. It cites to an out-of-circuit case stating that "when an appellate decision is without limitation as to how much of the trial court's decision is set aside, all is set aside." Hynning v. Partridge, 359 F.2d 271, 273 (D.C. Cir. 1966). But that court also explained that "an opinion and judgment [must] be read together," id., and, in context, we understand that court's statement to mean -- as we too have said -- that a mandate controls

not only those issues explicitly decided on appeal but also those decided "by reasonable implication," Ellis v. United States, 313 F.3d 636, 646 (1st Cir. 2002). See also Wampanoag Tribe of Gay Head (Aquinnah), 390 F. Supp. 3d at 190. As we have already discussed at length, we do not think a "reasonable implication" of Wampanoag I is that we decided the permitting issue.

Because we have determined the Tribe waived the permitting issue, and because we reject the procedural challenges to the amended final judgment, we now ask whether we might overlook the Tribe's waiver.

## C. Beyond Waiver

The second branch of the law-of-the-case doctrine -- the one that prohibits a party from raising an issue it could have previously appealed -- is "anchored in a sea of salutary policies." Ellis, 313 F.3d at 647; see also Cooper, supra, § 4478.6 ("There are powerful reasons to insist that all matters ripe for review at the time an appeal is taken be presented for review or abandoned."). These policies include (1) providing "litigants a high degree of certainty as to what claims are -- and are not -- still open for adjudication;" (2) promoting "finality and repose;" (3) encouraging efficiency; (4) avoiding inconsistencies; and (5) discouraging litigants from engaging in gamesmanship through attempts to shop for a perceived more favorable panel of judges.

Ellis, 313 F.3d at 647. Accordingly, in the absence of exceptional circumstances, a court should find waiver where a party could have raised an issue on appeal but did not. Matthews, 643 F.3d at 14.

The categories of exceptional circumstances are "rare and narrowly circumscribed." Id. We have identified only a handful:

> A party may avoid the application of the law of the case doctrine only by showing that, in the relevant time frame, controlling legal authority has changed dramatically; or by showing that significant new evidence, not earlier obtainable in the exercise of due diligence, has come to light; or by showing that the earlier decision is blatantly erroneous and, if uncorrected, will work a miscarriage of justice.

Id. (quotation marks and citations omitted). The Tribe suggests that a material change in controlling law came about when Wampanoag I reversed the district court, but, as we have explained, Wampanoag I did not purport to address the permitting issue, and the reversal itself stemmed from the application of a law on our books since the 1990s. See Wampanoag I, 853 F.3d at 624 (citing Narragansett, 19 F.3d at 702-04). Thus, the main exceptional circumstance arguably at play is the last one, "a hard-to-satisfy standard that requires us to have 'a definite and firm conviction that a prior ruling on a material matter is unreasonable or obviously wrong, and resulted in prejudice.'" Universal Truck & Equip. Co., Inc. v. Caterpillar, Inc., 653 F. App'x 15, 20 (1st Cir. 2016)

-31-

(unpublished) (quoting Moran, 393 F.3d at 8). We do not think that the district court got it obviously wrong.

Over twenty-five years ago, we presaged the issues at the core of this appeal, albeit in dicta:

> The crucial questions which must yet be answered principally deal with the nature of the regulable activities which may -- or may not -- be subject to state control, e.g., zoning, traffic control, advertising, lodging. It is true that nondiscriminatory burdens imposed on the activities of non-Indians on Indian lands are generally upheld. But it is also true that a comprehensive federal regulatory scheme governing a particular area typically leaves no room for additional state burdens in that area. Which activities are deemed regulable, therefore, will probably depend, in the first instance, on which activities are deemed integral to gaming. . . . [T]he distinction between core functions and peripheral functions is tenebrous, as is the question of exactly what [the state] may and may not do with respect to those functions that eventually are determined to be peripheral.

Narragansett, 19 F.3d at 705-06 (citations omitted). In Narragansett, we envisioned this analysis would require "a particularized inquiry into the nature of the state, federal, and tribal interests at stake," and we hypothesized that the "criss-crossing lines" of the analysis might "prove agonizingly difficult to decipher, let alone to administer." Id. at 705-706 (first quoting White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 145 (1980)). The district court was not nearly as fazed, and it sliced

-32-

right through the Gordian knot. It drew a bright line between the permitting issue and the gaming issue. We nevertheless cannot say that the district court's distinction was "unreasonable or obviously wrong" such that it would permit us to overlook the Tribe's waiver. Narragansett admitted that an outcome, like the district court's, was at least possible. See id.

The Tribe also suggests that the district court got it obviously wrong, because IGRA comprehensively regulates the construction, maintenance, and operation of Class II gaming facilities, such that there is "no room for additional state burdens in that area." Id. at 705 (citing Bracker, 448 U.S. at 148, a preemption case). IGRA requires the Chairman of the National Indian Gaming Commission to "approve any tribal ordinance or resolution concerning the conduct, or regulation of class II gaming on the Indian lands within the tribe's jurisdiction if such ordinance or resolution provides that . . . the construction and maintenance of the gaming facility, and the operation of that gaming is conducted in a manner which adequately protects the environment and the public health and safety." 25 U.S.C. § 2710(b)(2)(E). In support of its argument, the Tribe cites cases where courts discussed whether IGRA preempted state taxes. See, e.g., Flandreau Santee Sioux Tribe v. Noem, 938 F.3d 928, 937 (8th Cir. 2019) (holding a "South Dakota use tax on nonmember purchases

of amenities at the Casino . . . preempted by federal law"), cert. denied, 140 S. Ct. 2804 (2020); Flandreau Santee Sioux Tribe v. Haeder, 938 F.3d 941, 945 (8th Cir. 2019) (holding that an "IGRA provision does not expressly nor by plain implication preempt the State's contractor excise tax, a tax which does not regulate or interfere with the Tribe's design and completion of the construction project, or its conduct of Class III gaming"); Video Gaming Techs., Inc. v. Rogers Cnty. Bd. of Tax Roll Corr., 475 P.3d 824, 834 (Okla. 2019) (holding that the "ad valorem taxation of gaming equipment here is preempted"), cert. denied, 141 S. Ct. 24 (2020). Whatever the import of these preemption cases, they are not as compelling in the context of implied repeal. "The rationale for encouraging preemption in the Indian context -- that the federal government is a more trustworthy guardian of Indian interests than the states -- has no relevance to a conflict between two federal statutes," and, therefore, "[t]he doctrine of implied repeal operates without special embellishment in the Indian law context." Wampanoag I, 853 F.3d at 627 (quoting Narragansett, 19 F.3d at 704). In any event, we cannot say that the law is so clear that § 2710(b)(2)(E) amounts to an implied repeal of the Settlement Act to the extent the Tribe argues. Cf. Haeder, 938 F.3d at 945 ("Other than requiring NIGC approval of a tribal ordinance stating that Casino construction will adequately protect the environment

-34-

and public health and safety, the Commission does not actively regulate construction activity or prescribe what adequate protection of public health and safety requires."); id. at 947 (Colloton, J., concurring in the judgment) ("There is no comprehensive and pervasive federal regulatory scheme of casino construction that precludes state taxation.").

Thus, we do not have the definite and firm conviction that the district court's ruling was unreasonable and obviously wrong required to constitute an exceptional circumstance. And because this case does not qualify as one involving an exceptional circumstance, we cannot look past the Tribe's waiver of the permitting issue.

### III.  Closing Thoughts

All said, "[d]isposing of an appeal on technical or procedural grounds rarely feels satisfying." Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 30 (1st Cir. 2015).  But because the Tribe did not pursue the permitting issue in Wampanoag I, though it could have, and because this case does not present exceptional circumstances, we have no choice but to find the permitting issue waived.

Before we go, however, we add just a few notes.  Nothing in this opinion necessarily precludes the filing of a motion under Fed. R. Civ. P. 60(b)(5) or (6) should the Tribe conclude that it

has a basis to maintain that the local regulations as applied by the Town turn out to interfere with the integral activities of gaming in a manner or to an extent not anticipated by the district court. Nor do we express any view on whether any particular local regulatory law that, as applied, effectively precludes a gaming establishment is for that reason itself a "Gaming Law" as defined by the district court. Third Am. Final J. 2-3, ECF No. 230 (defining "General Regulatory Laws" as excluding "Gaming Laws," which encompass any law that "prohibit[s]" gaming).

We also wish to highlight a sentiment expressed by the district court. It explained that the Town may not enforce its laws "in a nonneutral way in order to unduly burden or harass the [T]ribe or to prevent them from opening the casino." The Tribe has not waived a challenge to the state and local permitting requirements should the Commonwealth or the Town treat the Tribe in an arbitrary or unequal manner.[10]

With those avenues still open to the Tribe, we close with this. The parties have been litigating this dispute since 2013, and "we do not mean to encourage the protagonists to litigate ad infinitum." Narragansett, 19 F.3d at 706. "If cool heads and

---

[10] The Town assures us that it has treated and will continue to treat the Tribe as it would anyone else. That said, it should be kept in mind that the Tribe does have a unique federal right to pursue gaming activities not afforded others.

fair-minded thinking prevail," we may yet avoid a third round of appeals between these parties.  Id.

The district court's judgment is affirmed.  Each side shall bear its own costs.